**Santiago Nahun ONTUNEZ–TURSIOS, Petitioner,**

v.

**John ASHCROFT, U.S. Attorney General, Respondent.**

No. 00–60650.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 2002.

Michael Holley (argued), South Texas Pro Bono Asylum Representative Project, Harlingen, TX, for Petitioner.

John Clifford Cunningham (argued), Allen W. Hausman, Thomas Ward Hussey, Director, Emily Anne Radford, Asst. Director, A. Ashley Tabaddor, U.S. Dept. of Justice, Civil Div. Imm. Lit., Washington, DC, E.M. Trominski, Dist. Director, U.S. INS, Harlingen, TX, Caryl G. Thompson, U.S. INS, Attn: Joe A. Aguilar, New Orleans, LA, for Respondent.

Before GARWOOD, WIENER and CLEMENT,[1] Circuit Judges.

GARWOOD, Circuit Judge:

Honduran citizen Santiago Nahun Ontunez–Turcios appeals the denial of his application for asylum and withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("Act") and

---

1. Judge Edith Brown Clement participated by designation in the oral argument of this case as a United States District Judge for the Eastern District of Louisiana. Since that time she has been appointed as a Fifth Circuit Judge.

the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention"), arguing that his efforts as part of a Honduran land collective make him a "refugee." The immigration judge and Board of Immigration Appeals held that Ontunez's evidence only demonstrated that his land conflict was private and economic in nature, that any persecution of him was not shown to have been on account of his political opinion or membership in a particular social group, and therefore he was not entitled to asylum or withholding of removal. Because Ontunez has not presented evidence that compels the opposite result, we affirm.

## Background

Honduran land reform laws under certain circumstances allow peasant farmers—"campesinos"—to gain ownership of land lacking a proper legal title by cultivating it as part of an agrarian reform plan. *See* Steven E. Hendrix, *Property Law Innovation in Latin America With Recommendations,* 18 B.C. INT'L & COMP. L.REV. 1, 38 (1995). Their efforts, however, are sometimes opposed by business or landowner interests with plans for private agricultural or other investment. When legal methods fail the campesinos, they sometimes occupy private agricultural land illegally and the government evicts them by such minimal force as is necessary. *See* United States Department of State, *Honduras: Profile of Asylum Claims & Country Conditions,* January 1999, at 5–6. Although Honduras has elected five presidents in a row through generally fair and democratic elections, the economic and official elite still possess "considerable impunity." *See id.* at 2; United States Department of State, *Honduras Country Report on Human Rights Practices for 1998,* at 1.

Conditions in Honduras were vastly worsened in October 1998, when Hurricane Mitch devastated the country. From out of this difficult situation, Ontunez brings his request for asylum and withholding of removal.

The factual background of this case comes almost exclusively from Ontunez's own testimony, both at the hearing before the immigration judge and in his application for asylum. Ontunez testified that in April 1994, he moved to the city of La Ceiba on the northern Caribbean coast of Honduras with his live-in companion and his son. He worked as a mechanic and joined with other campesinos who wanted to cultivate an area in La Ceiba called Las Delicias. A woman in the town claimed to have title to Las Delicias through a document she had never registered; she executed a power of attorney in favor of the campesinos but refused to register her legal title because her husband had been murdered in 1965 and she feared reprisals against her son. Each family began cultivating an area of sixty by forty meters, and they created a cooperative called the Foundation for the Betterment of Las Delicias for the purpose of acquiring legal title to the land. Ontunez was "First Speaker" for the Foundation, which meant that he read the minutes at meetings and encouraged the other campesinos to remain united in the pursuit of their goal.

In 1996, a group of businessmen challenged the Foundation's right to the land. This group consisted of five local "landlords," including Eugenio "Henyo" Varela ("Varela") and Mario Melgar ("Melgar"). Ontunez alleges that Melgar is an attorney who represents Mario Facusse, the majority stockholder of a prominent Honduran business [2] and the nephew of Carlos Ro-

---

2. In his asylum application, Ontunez calls the

corporation "Gigante." At his hearing, the

berto Flores Facusse, President of Honduras since 1998.[3] The landlords[4] claimed they had legal title to Las Delicias and made plans to sell it to Korean investors.

In late 1996, the landlords threatened to drive the Foundation's members from Las Delicias. In 1997 a judge ordered Las Delicias cleared, apparently at Melgar's request, despite Ontunez's allegations that the landlords produced no evidence of title justifying the legal action. The police enforced the order by removing the campesinos from the land and completely destroying their homes, but the Foundation returned to Las Delicias and rebuilt. At around this time, Foundation treasurer Jesus Pascual was killed. While Ontunez blames the landlords, he admitted that there was no evidence of who committed the crime.

The landlords then obtained a "new order" of some kind and offered to settle the legal title issue with the campesinos for 1,000 lempiras per plot. The Foundation asked for a hearing before the mayor so that they could determine whether the landlords had any valid claim to the land justifying the payments. Mayor Marjorie Dik declined to hold the hearing. Ontunez alleges that while Dik had generally supported the Foundation because of its work building a school, she feared reprisals from Varela if she declared the land belonged to the cooperative. In his application for asylum, Ontunez intimated that Dik left office in 1998 because of this fear.[5]

In 1998, Gonsalo Rivera O'Campo was elected mayor of La Ceiba and the Foundation again pursued a hearing to negotiate the question of land title. The parties expected Governor Adalberto Giron Romero to attend the March 1998 meeting, but he ultimately refused. Ontunez alleges Giron abstained because he believed the landlords had no valid title, making the negotiations illegitimate. Ontunez also alleged his belief that Giron was subsequently removed from office by President Flores because of his support for the Foundation.[6]

After the proposed O'Campo hearing failed in March 1998, the Foundation and the landlords agreed to come together at a public meeting to discuss the offered settlement. The Foundation arrived first, and Ontunez began denouncing official corruption through an amplified microphone. At least four of the landlords[7] arrived with Marcos Puerto ("Puerto") and two Honduran police in their company. When the

court reporter was unable to understand the name of the corporation but transcribed it phonetically as "Essay."

3. The INS did not challenge this assertion or produce evidence to the contrary. Though there are indications that Mario Facusse may be a cousin to the Honduran president, not a nephew, we will consider the evidence as it stood before the BIA. Similarly, we will not consider indications that Mario Facusse may belong to a different political party than Flores and may openly oppose him.

4. The briefs for the appellant call these businessmen "The Facusse Group," although Ontunez did not use that name. We will use Ontunez's nomenclature, "the landlords."

5. However, Ontunez testified that Dik served her full term as Mayor. Perhaps his application intended to suggest that her fear of reprisals caused her to not seek re-election.

6. Ontunez's testimony was inconsistent on this point; twice he claimed Giron was removed from office prematurely and once he testified that Giron merely left at the end of his term.

7. Ontunez does not list Melgar as being among the landlord group, although he appears to suggest that they used Melgar's car to drive to the meeting. At another point, however, Ontunez blamed Melgar for bringing the police to the meeting, and attributes to Melgar a statement implying that he was in the car when the assassin got in.

men were about 25 meters away from Ontunez, Varela nodded to Puerto, who pulled out an AK–47 rifle and shot Foundation guard Juan Mejia. While Ontunez took cover, the landlord group returned to their car and left.

Dissatisfied with the La Ceiba police's investigation into the murder and concerned for their safety, Foundation members looked for Puerto themselves. In April, they received a tip that Puerto was located on the property of Mario Facusse in the city of San Pedro Sula. The Foundation told the Department of Criminal Investigations of his location, and the San Pedro Sula police arrested Puerto. Ontunez testified that the president of the Foundation, Rosa Mejia, told Ontunez that she had been present during Puerto's interrogation by the police and that Puerto had then admitted that the landlords hired him to assassinate Ontunez and another man, but that he shot Juan Mejia by mistake. Ontunez speculated that that error came from Puerto's misinterpretation of Varela's nod toward the Foundation members. Puerto was prosecuted for his crime, convicted, and incarcerated.

In October 1998, Ontunez went to the land title office in La Ceiba, where he met and confronted Melgar. Both men were apparently searching for title records for Las Delicias. Ontunez accused Melgar of being an accomplice to the death of Mejia, while Melgar apparently denied the allegation and claimed that he was afraid of the assassin as well. Ontunez's search of the land records turned up no registered title to Las Delicias. It was in this month that Hurricane Mitch hit Honduras and devastated the nation, destroying nearly everything in Las Delicias. Among the items

destroyed were the Foundation's collection of public documents regarding the landlords. Ontunez testified that he had been to several cities gathering the criminal histories of the landlords and their employees as well as records of the complaints filed against them.

In April 1999, six months after the confrontation with Melgar, the landlords or those Ontunez thought to be acting for them came armed to Ontunez's home and threatened his life. Ontunez feared for his safety and fled to his brother's house in San Pedro Sula, leaving his family behind. By the end of July, Ontunez missed his family and returned to Las Delicias, despite his fear of being killed. When he returned, two of the landlords and their guards came to Ontunez's house with weapons and ordered him to leave town within one month and fifteen days or they would remove him from Las Delicias, either in "a good way or in a bad way."[8] An unidentified young man was with them, who stared at Ontunez during the meeting. After they left, a neighbor told Ontunez that the young man had said "this deer will not escape me" or words to that effect. Ontunez took this as a death threat and described the young man as a paid assassin, but admitted that he had no direct knowledge of the young man's motive. At the urging of his mother, Ontunez left his family behind and fled Honduras. He first entered Guatemala legally, and then traveled to Mexico and crossed the Rio Grande river near Hidalgo, Texas. He was apprehended by the Border Patrol while attempting to evade the Falfurrias checkpoint on September 19, 1999.

Ontunez conceded his removability at a hearing on October 15, 1999[9] and applied

---

**8.** Ontunez's story regarding these two confrontations is frequently confusing, especially comparing his application for asylum and his oral testimony. This version of events is the

one that best fits Ontunez's various assertions and his clarifications in cross-examination.

**9.** The transcript is dated April 15, 1999, but from other documents it seems clear that

for asylum. At his hearing before the immigration judge on December 15 and 20, 1999, Ontunez offered the above testimony and some documents. Among these documents was a letter from Raul G. Tovar Ramos, present governor of Atlantida, which attests to Ontunez's good character and corroborates that Ontunez's life was threatened by "various unscrupulous persons and neighbors" in La Ceiba. Governor Tovar also attests that Ontunez was a victim of Hurricane Mitch. In another document, Honduran attorney Paul Tovar Vargas avers that Ontunez has charged "several individuals of dubious reputation" in La Ceiba of threatening his life in an attempt to take his land, and that this was the reason he emigrated to the United States.

The immigration judge noted that an application for asylum should also be construed as an application for withholding of removal under both the Act and the Convention, and then denied Ontunez relief on all three counts. Despite pointing out several inconsistencies in Ontunez's testimony, the immigration judge found his testimony generally credible. Nevertheless, the judge held that Ontunez was not a "refugee" as defined in 8 U.S.C. § 1101(a)(42) because his situation did not arise "on account of" any of the five enumerated motives for the claimed persecution: "race, religion, nationality, membership in a particular social group, or political opinion." Ontunez failed to carry his burden, the immigration judge held, because his conflict with the landlords was not shown to arise other than solely from a private fight over land. The landlords did not act against Ontunez because of Ontunez's political opinions or membership in a particular social group. Accordingly, the judge denied Ontunez's requests for asylum and with-

holding of removal under the Act. The judge also held that Ontunez had not shown he would be subject to torture upon return to Honduras and thus denied Ontunez's claim under the Convention.

The Board of Immigration Appeals acknowledged that Ontunez had demonstrated that the landlords possessed both the economic desire to sell Las Delicias to foreign investors and a willingness to threaten those who got in the way, but concurred with the immigration judge that Ontunez had not shown a nexus between the persecution and one of the persecutors' motives enumerated in the Act. The BIA then discussed the Convention's requirement of a government connection to the feared torture and held that Ontunez was not entitled to protection under the Convention because he had not shown that a government official would instigate torture or acquiesce to it. The BIA dismissed Ontunez's appeal and he timely appealed to this court.

### Discussion

#### I. Legal Error in the Asylum Claim

■ Ontunez first asserts on appeal that the BIA applied an incorrect legal standard to his request for asylum. We review the BIA's conclusions of law *de novo*. *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir.1997). We review the decision of the BIA, and reach the underlying decision of the immigration judge only if that decision has some impact upon the BIA's opinion. *Id.*

■ Section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a), grants the Attorney General the discretion to permit asylum to an alien who is a "refugee," a term which is defined as an alien who is unable or unwilling to

"April" is an error.

return to his or her country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A). Ontunez's legal error appeal concerns the "on account of" language, which requires the alien to prove some nexus between the persecution and the five protected grounds. *See generally INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Ontunez claims that the BIA looked at his evidence only as proof of economic conflict without considering that it also demonstrates a political struggle. Therefore, Ontunez argues, the BIA applied too stringent a standard and effectively required him to demonstrate that his persecution was *primarily* on account of a protected ground rather than merely that his persecution had *some* nexus to a protected ground.

Ontunez relies upon *Rivas–Martinez v. INS*, 997 F.2d 1143 (5th Cir.1993), a case in which the BIA incorrectly applied an "either-or" analysis to the "on account of" requirement. In *Rivas–Martinez*, El Salvadorean FMLN guerillas ordered Rivas to help them in their struggle against the government, but she refused. *Id.* at 1145. She told the guerillas she could not help them because she was a widowed mother and had to give constant care to a small child; she actually refused because she strongly supported the government. *Id.* When the guerillas refused to accept her proffered reason, she chose to flee rather than support the FMLN. *Id.* While the immigration judge granted her asylum, the BIA reversed because it reasoned that *Rivas–Martinez* had given a non-political reason for her refusal and thus logically could not have been persecuted "on account of" a political opinion as required in the Act. *Id.* On appeal, this court reversed the BIA and remanded for recon-

sideration. Without examining the sufficiency of Rivas's evidence, we found that the nexus requirement is not an "either-or" proposition. Instead, the proper standard allows the applicant's testimony to prove the necessary persecution even though other evidence fails to advance her cause. Thus, while Rivas offered a non-political excuse to the guerillas, it was error for the BIA to categorically prevent her from showing political persecution through *other evidence*. After all, the *guerillas* may have known her statement was false because they had other knowledge of her politics. *Id.* at 1147–48. Accordingly, we remanded to the BIA for reconsideration. *Id.*

■ It is true that *Rivas–Martinez* counsels that the applicant must merely demonstrate some nexus between persecution or a well-founded fear of persecution and one of the conditions enumerated in 8 U.S.C. § 1101(a)(42), notwithstanding evidence that persecution may have also been based upon other reasons. The BIA correctly applied this standard to Ontunez's case, however. The BIA stated in its opinion:

> "Regardless of the fact that the Facusse Group may have been aware of the respondent's claimed political opinion, we find that based on the record before us, the respondent failed to establish that the Facusse Group's alleged destruction of his home and crops and threats to kill him are *in any way related to* his political opinion, rather than to the Facusse Group's desire to retaliate against him or intimidate him for his actions in convincing the members of the land cooperative of which he was a leader to not give up the cooperative's lands to the Facusse Group, which land the Facusse Group wanted to complete a business deal with foreign investors." (emphasis added)

Unlike *Rivas–Martinez*, in which the BIA *clearly* stated an incorrect legal standard, the BIA appears to have stated and applied the correct legal requirement. The BIA asked the correct question: does the evidence demonstrate persecution or fear of persecution "on account of" political opinion? They state the standard as "in any way related to," which admittedly is not a word-for-word restatement of the standard. Yet, it demonstrates that the BIA understood the necessity of a nexus and found that no nexus existed, thus arguably construing the proper legal standard *even more generously in Ontunez's favor.* We therefore do not read the BIA's opinion as holding that Ontunez could never prove a nexus between his political opinion and persecution by the landlords because his evidence demonstrates an economic motive. Instead, the BIA simply held that Ontunez's evidence showed no motive of the persecutors other than a private, economic one and failed to establish persecution to any extent on account of or motivated by Ontunez's political opinion or membership in a particular social group. The BIA did not disregard mixed motive; Ontunez failed to meet his burden of proof of a mixed motive. *Rivas–Martinez* therefore does not apply.[10]

This court addressed similar language in *Girma v. INS*, 283 F.3d 664 (5th Cir.2002). In *Girma*, the petitioner claimed that the INS had failed to properly comprehend the "mixed motive" doctrine, erroneously requiring Girma to exclude all possibilities other than the protected factors. *Id.* at 667. Girma relied heavily on the BIA's use of the words "rather than," *id.* at 668, which suggested the either-or dynamic forbidden in mixed motive cases. After de-

ciding that other portions of the opinion showed the BIA had in fact applied the mixed motive standard correctly, this Court stated that:

> The BIA's use of the phrase "rather than," was not an expression of a mutual exclusivity standard between protected and unprotected grounds but an explanation of its findings concerning the sufficiency of the evidence relative to multiple possible motivating grounds, two of which are protected and one which is not. *Id.*

We apply the same analysis and reach the same conclusion. While Ontunez strenuously disagrees with the BIA's conclusion, and while the BIA used language more equivocal than would be ideal, Ontunez has not shown that the BIA misunderstood the standard to be applied to his case. Ontunez's claim of legal error must fail, and accordingly we will affirm the BIA's decision.

## II. Factual Sufficiency in the Asylum Claim

■■■ Ontunez next argues that the BIA erred by finding his evidence insufficient to support a claim of persecution on account of political opinion or membership in a particular group. This court reviews "factual findings by the Board to determine if they are supported by substantial evidence in the record." *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir.1997). "The substantial evidence standard requires only that the Board's conclusion be based upon the evidence presented and be substantially reasonable." *Silwany–Rodriguez v. INS*, 975 F.2d 1157, 1160 (5th Cir.1992) (quoting *Rojas v. INS*, 937 F.2d

---

**10.** Moreover, in *Rivas–Martinez* the guerillas who threatened Rivas were an overtly political anti-government guerilla force, which immediately suggested a nexus between Rivas's political stand and the actions of the FMLN.

Here, Ontunez's enemies are not shown to have any political agenda. This is another distinction between Ontunez's case and Rivas's.

186, 189 (5th Cir.1991)). For this Court to reverse a factual finding of the BIA, the applicant must show that "the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992); *Lopez–Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001).

### a. Political Opinion

 In order to gain asylum because of persecution due to political opinion, the alien must first show that his persecutors' actions were motivated by his, the alien's, political opinions. *Rivas–Martinez*, 997 F.2d at 1147. The relevant question is the motivation of the persecutor. The alien must demonstrate through some evidence, either direct or circumstantial, that the persecutors know of his (the alien's) political opinion and has or will likely persecute him *because* of it. *Id.* Ontunez argues that he produced evidence that *compels* such a finding.

Ontunez relies upon two cases in which circuit courts found the applicant's actions to be political. In the first, *Osorio v. INS*, 18 F.3d 1017 (2nd Cir.1994), a Guatemalan union leader fled to the United States after violence broke out in connection with his union's struggle with their employers, the Guatemalan government. The immigration judge denied asylum and withholding of deportation, and the BIA affirmed that decision on the grounds that struggles between labor and management were economic in nature. *Id.* at 1028. The Second Circuit reversed because it interpreted the BIA's decision as having illogically concluded that evidence of economic motivation precludes any finding of political persecution, much like our decision in *Rivas–Martinez*. *Id.* The court found that Osorio's activities had a political aspect be-

cause *the government* perceived the union's economic struggle as threatening its political power. *Id.* at 1029–30.

The second case cited by Ontunez is *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988). In that case, Haitian fisherman Desir was ordered to pay bribes to the *Haitian security force*, the Ton Ton Macoutes. When he failed to pay the required bribes, Desir was arrested and assaulted by the Macoutes. *Id.* at 724–25. Desir fled to the United States, where the immigration judge and BIA refused him asylum or prohibition of deportation because his persecution arose solely because he failed to pay money. *Id.* at 725. The Ninth Circuit reversed, holding that Desir had amply proven that he was persecuted on account of his political opinion. The court relied upon sources deeming Haiti a "kleptocracy," or government by theft, and recognized that the failure to pay bribes in such a government not only offended the Ton Ton Macoutes's finances, but their politics as well. *Id.* at 727–28. Because the Duvalier regime ruled by the fear engendered by these forced bribes, Desir's resistance led to his categorization as a subversive. This categorization, the court held, was properly categorized as political resistance. *Id.* at 728.

In contrast, the INS refers us to the case of *Cuevas v. INS*, 43 F.3d 1167 (7th Cir.1995). In that case, Felisa and Teofilo Cuevas owned land in the Philippines and rented it to farmers who used it to grow rice. The tenants stopped paying rent and eventually demanded the right to buy the land. When the Cuevases refused, they were threatened by anonymous people whom they believed were connected with the New People's Army, the armed wing of the Communist Party in the Philippines. *Id.* at 1169. The Cuevases fled to America, but the immigration judge and BIA determined that they had not shown a

well-founded fear of persecution on account of their political opinion. *Id.* The Seventh Circuit agreed, holding that despite the possible political connection "[p]etitioners have transformed a relatively minor land dispute in an isolated part of their country into a paranoic [sic] fear of harm anywhere in the Philippines." *Id.* at 1171.

Ontunez's case does not resemble *Osorio* and *Desir,* cases in which the alien acted in direct opposition to government policies. and instrumentalities. In those cases, the direct government connection cast a political shadow over an otherwise largely economic claim. Here, the closest connection between Ontunez and the government is that he stands in economic competition with the attorney for a businessman who is the nephew of the man who became President in 1998. Ontunez also draws a governmental connection from the fact that two local police officers were with the landlords when Puerto assassinated Mejia. Neither connection compels us to read his evidence in a new, more overtly political light.

■ On appeal, Ontunez must set forth evidence so compelling that "no reasonable factfinder could fail to find" the requisite elements. *Elias–Zacarias,* 112 S.Ct. at 817. Ontunez has not met this very difficult requirement because reasonable factfinders could be unpersuaded that the landlords were motivated by the political aspects of Ontunez's struggle. The landlords did not demand Ontunez's silence, they only demanded that he leave Las Delicias "in a good way or a bad way." This suggests that the landlords neither hated him for his general political opposition to the moneyed elites nor wished to silence his impassioned speeches; they just wanted him off the land so they could develop it. Second, Ontunez did not receive any threats while he was in San Pedro Sula, which suggests that the landlords were satisfied so long as he remained off the land. Third, we note that the landlords were willing to settle the land title issue with the campesinos. While the sum they demanded may have been more than the farmers could pay, as Ontunez alleges in his brief, the offer need not have been a sham and may have been a fair offer given Ontunez's testimony regarding the land's economic potential. At any rate, the offer indicates that the landlords were interested in the economic potential of Las Delicias and not in the broader political struggle.

While the landlords' focusing on the leaders of the Foundation rather than the rank-and-file campesinos might arguably suggest a political motive, that argument ultimately fails because the evidence suggests that the landlords would not accept the passive presence of the campesinos any more than they accepted the vocal protests of Ontunez and the Foundation. Their goal was simply a vacant Las Delicias. As a result, we cannot say that all reasonable factfinders would feel compelled to accept Ontunez's interpretation of or inferences from the facts. We affirm the BIA's decision in this respect.

### b. Membership in a Particular Social Group

■ Ontunez next claims that substantial evidence compels the conclusion that he was persecuted on account of his membership in the particular social group of "land rights leaders." To establish that he is a member of a "particular social group," he must show that he was a member of a group of persons that share a common characteristic that they either cannot change or should not be required to change because it is fundamental to their individual identities or consciences. *See Matter of Acosta,* 19 I&N Dec. 211, 233, 1985 WL 56042 (BIA 1985). Once the

alien has made this showing, he must also show that he was persecuted "on account of" such membership.

The BIA did not reach the issue of whether Ontunez was a member of a particular social group constituted of activist agrarian cooperative leaders because it held that Ontunez had not shown that the landlords' actions were "on account of" such membership. Ontunez argues that the BIA made an impermissible "metaphysical" distinction between his status as a resistance leader and the actions that led to that status; that is, that the BIA relied on the actions themselves without considering their import. We disagree with this construction, which takes a valid distinction and attempts to render it incoherent.

 The evidence does not compel a finding that the landlords cared whether Ontunez was in the particular social group of "activist agrarian cooperative leaders"; it shows they cared about the land in Las Delicias but does not compel the conclusion that they cared about his activism generally. Ontunez only offered evidence of persecution against the Foundation, not against other agrarian leaders. The fact that a persecutor has not opposed other members of the same group suggests that the persecution was not on account of that group membership. *See Matter of R–A–,* Interim Decision 3403, 1999 WL 424364 (BIA 1999) ("If group membership were the motivation behind his abuse, one would expect to see some evidence of it manifested in actions toward other members of the same group."). Similarly, Ontunez offered no evidence suggesting that the landlords would be happy to allow the campesinos to stay if their leadership departed, as might be expected if the landlords were motivated by his membership in the group of activist leaders. Neither does his evidence suggest that the landlords would oppose him if he were a member of the agrarian

activists but not impeding their plans for Las Delicias. Instead, Ontunez essentially testified that the landlords only cared about getting Las Delicias or an equivalent amount of cash.

Ontunez failed to present evidence that takes the crucial step from persecution because of economic desire to persecution because of membership in the group of land activists. The distinction is not "metaphysical." Because he has not demonstrated evidence so compelling that reasonable factfinders could not find otherwise, we affirm the decision of the BIA in this respect.

### III. The Convention Against Torture

 Ontunez's final arguments concern his claim for withholding of deportation under the Convention Against Torture. He argues that the BIA applied an incorrect legal standard to his case, and that his evidence compels findings of fact different than those reached by the BIA. We apply the same standards of review applied to the BIA's holdings on asylum claims. *See Carbajal–Gonzalez v. INS,* 78 F.3d 194, 197 (5th Cir.1996) (discussing those standards); *Kamalthas v. INS,* 251 F.3d 1279 (9th Cir.2001) (applying same standards to Convention review); *Ali v. Reno,* 237 F.3d 591 (6th Cir.2001) (generally applying the same standard to the Convention). We must let stand a decision that an alien is not eligible for admission to the United States unless that decision is "manifestly contrary to law." *Ali,* 237 F.3d at 596; 8 U.S.C. §§ 1252(b)(4)(c).

#### a. Legal Review

 Ontunez first argues that the BIA adopted the incorrect legal standard when it stated:

[T]he respondent must provide evidence that the torture he fears at the hands of the Facusse Group or their hit man

would be "at the instigation of or with the consent or acquiescence of" Honduran officials or persons acting in an official capacity. 8 C.F.R. § 208.18(a)(1). Because this statement did not include the burden of proof, which 8 C.F.R. § 208.16(c)(2) explains is "more likely than not," Ontunez asserts that the BIA applied an incorrect legal standard in reviewing his evidence. We disagree. Not every explanation of law must contain the burden of proof to be true, and the BIA's statement is correct as far as it goes. Nothing in the BIA's opinion demonstrates that it misapplied the burden of proof. We therefore reject this contention of Ontunez.

### b. Factual Review

 In order for Ontunez to succeed in his request for withholding of removal based on the Convention, he must meet his burden of showing that more likely than not he would be subjected to "torture" upon his return. See 8 C.F.R. § 208.16(c)(2). Torture is defined in 8 C.F.R. § 208.18(a)(1), which requires *inter alia* that the "pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." The regulations later clarify that "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). "Willful blindness" suffices to prove "acquiescence." See In re S–V–, Int. Dec. 3430, 2000 WL 562836 (BIA 2000) (en banc).

 The BIA rejected Ontunez's request for withholding of deportation because he failed to show that Honduran public officials would acquiesce in his torture. Specifically, the BIA held that even

if the landlords had general support in some sectors of the Honduran government, that support alone did not establish that Honduran officials would acquiesce in his torture. Ontunez challenges this finding, pointing out other governmental connections in his story: the police escort to the Mejia assassination, the fact that the police never apprehended the landlords for the assassination, the police clearing Las Delicias in 1997, the impunity given the landlords while they persecuted Foundation leaders, and the Honduran government's policy of dislodging squatters. Ontunez claims all this evidence would compel reasonable factfinders to find the necessary acquiescence by the Honduran government.

We disagree that his evidence compels a different result than the one reached by the BIA. First, while the police escort to the Mejia assassination is troubling, the police ultimately arrested Puerto, convicted him, and incarcerated him. Second, though the landlords were not arrested for the crime after Puerto's confession, Ontunez's testimony that Melgar denied complicity in the assassination provides at least some explanation why the Honduran government did not prosecute or arrest them. Third, Ontunez argues police complicity in the clearing of Las Delicias, but he also testified that it was done pursuant to a court order. We can hardly fault the Honduran police for enforcing court orders, even though Ontunez claims the order was tainted. Fourth, the Honduran government does indeed have a policy of dislodging squatters, as noted in a State Department report, but Ontunez fails to note that the report says that the government only dislodges squatters who are on the land illegally, and does so with minimal force. See United States Department of State, *Honduras: Profile of Asylum Claims & Country Conditions,* January 1999, at 5–6. This does not suggest they

would turn a blind eye to torture. Finally, the possible connection between Melgar and President Flores does not compel a finding that the President would ignore torture, especially in light of Ontunez's repeated testimony that the landlords attempted to follow the legal process.

Ontunez has not presented evidence that compels a finding that officials would acquiesce in "torture" committed by the landlords. Accordingly, we will affirm the decision of the BIA.

### Conclusion

Though Ontunez was placed in danger by his fight for Las Delicias, he has not proffered evidence that *compels* a finding that the danger arose from his persecutors' view of his political opinions or his membership in the group of land activists. Neither does the evidence compel the conclusion that the Honduran government would acquiesce in acts of torture by the landlords. Finally, we are not persuaded that the BIA made material legal errors in its opinion. The decision of the BIA must therefore be affirmed.

AFFIRMED.

WIENER, Circuit Judge, dissenting:

Recorded history is replete with examples of class struggles over land between the land-less and the landed. Some clashes have been armed and violent; others have been political and non-violent. In most instances, the land-less protagonist comprised the poor, the dispossessed, the disenfranchised; the landed protagonist comprised the wealthy, the socially prominent, the politically potent. In combination, these traits have produced multi-faceted motivations, defying analytical efforts to isolate any single factor as the sole producing "cause" of the conflict. Indeed, in these class struggles cum land use or ownership struggles, the intertwining of the political, economical, social, and property-holding motivations inevitably proves inextricable, rendering fruitless any analytical effort to isolate one causal factor. As such, attempts to parse these elements invariably prove speculative at best, presenting classic examples of the venerable riddle, "which came first, the chicken or the egg?"

Thus history's lesson is that when the political-social-economic "haves" (hereafter the "elite") are the ones who initiate the land grab (whether by facially lawful processes, by coercion, by duress, or even by force), they do so not solely to entrench or enhance their financial worth, but also to entrench or enhance their political and societal standing, influence, and control. Conversely, when the political-social-economic "have nots" (hereafter, the "underclass") are the ones who initiate the land grab (whether by exercising the vote or engaging in non-violent acts of civil disobedience, or even by fomenting violent risings or revolutions) they do so not solely to improve their economic well being and obtain landed status; they also do so to dislodge the numerically inferior elite from exclusive land ownership and control, social preeminence, and political domination.

Persecution is a frequent byproduct of these land struggles: sometimes subtle, sometimes heavy-handed; sometimes preventive, sometimes exemplary or vengeful; but persecution nonetheless. When viewed in historical context, any effort to identify a single "belief" that the prevailing class ascribes to targeted members of the opposing class as the justification for persecution inevitably results in either fruitlessness or an overly simplistic (and inaccurate) conclusion. A faithfully objective analysis inevitably identifies an inseparable combination of beliefs that brings persecution to the holder.

This is the stuff that *mixed motivation* is made of; and the panel majority's approbation of the immigration judge's (IJ) and the Board of Immigration Appeal's (BIA) identification of but a single belief of Ontunez that motivated the Facusse Group to persecute him, i.e., his economic philosophy or goal, is the flaw that I perceive in the denial of asylum to Ontunez. By shoehorning his reasonable fears of persecution into the single "economic" cubbyhole and failing to recognize the fallacy of attempting to ascribe that (or any) *single* persecution motive to the Facusse Group based on its perception of Ontunez's belief, turns a blind eye to the realities of the situation. I am convinced that when Ontunez's motivating beliefs are viewed from the vantage point of his once and future persecutors (which precedent instructs us to do), their motivation to terrorize him simply cannot be ascribed to a perception that his sincerely held "beliefs" were exclusively *economic* in nature.

Given the testimony and supplemental evidence adduced by Ontunez (whom the IJ found to be fully credible) the beliefs for which he was persecuted by a faction of the Honduran elite and for which he holds a reasonable fear of future persecution if he is forced to return to his homeland, were not exclusively about economics, but were substantially (if not primarily) about the social and political implications of the elitists' land grab (in reaction to which he helped organize and lead a peasants' opposition). Even if Ontunez's persecutors also perceived that his economic stake in the struggle was *an* impetus of Ontunez's opposition to their plan to dispossess these farmers and "flip" their erstwhile farm property to foreign investors, there can be no question that his genuine *political* beliefs were perceived by the elite as *a* reason for them to persecute him. From the standpoint of the elite, their singling out Ontunez for persecution was grounded in substantial part in their perception of his espoused *belief* in the need to eradicate political subjugation and deprivation of the peasants' civil rights through abuse of political and police power—a quintessential political belief for which he was persecuted.

The fallacy that I see as overarching the reasoning employed by the IJ, the BIA, and—with respect—the panel majority, lies in their confusing the persecutors' motive for grabbing the land—*economic*—with their motive (or one of several motives) for persecuting Ontunez—their clear recognition of his sincerely held *political* beliefs. We are instructed by the Supreme Court in *INS v. Elias–Zacarias*[1], and bound by our precedent in *Rivas–Martinez v. INS*[2], to analyze the "belief" prong of the asylum test from the objectively determined viewpoint of the persecutors, i.e., the kind of antithetical *belief* that they ascribe to the asylum-seeker, not his or her subjective (or even disingenuously announced) belief. By first conflating the Facusse Group's (1) own *profit* motive and (2) their perception of Ontunez's *political* motive, then wrongly transferring the *economic* land acquisition motive *from* the persecuting elite *to* the persecuted refugee as the "belief" for which the elite did (and likely will again) persecute him, the IJ, *et al*, perverted the teachings of *Elias–Zacarias* and *Rivas–Martinez*. This in turn resulted in the denial of asylum for the absolutely wrong reason.

This conclusion is amply borne out by undeniable truths about Ontunez's homeland of Honduras: The large landowners

**1.** 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

**2.** 997 F.2d 1143 (5th Cir.1993).

and the prominent urbanites, who together wield all social and economic dominion, are virtually inseparable from those who control and operate the civil government (national, regional, and local) and the military establishment. As the State Department expressed in its Honduras Country Report, "[i]mpunity for members of the economic and official elite, exacerbated by a weak, under-funded, and sometime corrupt judicial system, contributes to human rights problems." [3]

In the instant case, the entanglement of the socio-economic elite and all branches of the government—civil and military; national and local; law enforcement and judicial—is quite literal. A former president of Honduras, Carlos Roberto Flores Facusse, is an uncle of one of the actively involved, "name" partners of the Facusse Group, which is the conglomerate identified as the instigator of Ontunez's persecution. Ontunez's testimony, which, as earlier noted, was fully credited and accepted by the IJ, describes in detail the Facusse Group's use of sham court orders, corrupt police personnel, and a public assassination to further its objectives. In light of these uncontroverted facts, I cannot join the efforts of my colleagues to sever surgically the incidental (or, at best, the inseparably intertwined) *economic* facet of Ontunez's motivation from the political facet, *as perceived by the Facusse Group.*

Inseparable as they are, the political aspect of his belief produced the group's antipathy toward, and persecution of, Ontunez, at least as much if not more than did the economic aspect. His outspoken social and political *beliefs* clearly provided substantial impetus for the elitists' persecution, thereby generating and justifying his well-founded fear of persecution *for his political beliefs*—and, ultimately, his entitlement to sanctuary here. This is why I respectfully dissent.

As the majority correctly notes, we affirm the BIA's ruling if we find that it is substantially reasonable and based on substantial evidence.[4] To have us overturn the BIA's order, then, Ontunez must demonstrate that the evidence he presented was so compelling that no reasonable trier of fact could fail to find that the Facusse Group's actions were *in any way* related to Ontunez's political beliefs, i.e., one of a mixture of motives, even if not the principal motive or only motive, for their persecuting him. Although our standard of review of the BIA's orders is a highly deferential one and therefore a high hurdle for Ontunez to clear, he need *not* show that the evidence compels the conclusion that the Facusse Group's persecution was based exclusively—or even principally—on his political beliefs.[5] He can succeed if he can show that the evidence compels the conclusion that the Facusse Group's conduct against him was *in any way* motivated by its antipathy toward his sincerely held *political* beliefs— as the Facusse Group viewed them. Based on his fully credited testimony, the documentary evidence, and comparable examples from the case law, I am satisfied that Ontunez met this burden and that we should have granted his petition.

The BIA's order did not extensively detail its reasons for rejecting Ontunez's argument, but its brief statement speaks volumes:

---

**3.** Honduras Country Report on Human Rights Practices for 1998, U.S. DEP'T ST, Feb. 26, 1999.

**4.** *Mikhael v. INS,* 115 F.3d 299, 302 (5th Cir.1997).

**5.** *Rivas–Martinez v. INS,* 997 F.2d 1143 (5th Cir.1993) (employing the "mixed-motive" analysis).

Regardless of *the fact that the Facusse Group may have been aware of the respondent's claimed political opinion,* we find that based on the record before us, the respondent failed to establish that the Facusse Group's alleged destruction of his home and crops and threats to kill him are in any way related to his political opinion, rather than to the *Facusse Group's desire to retaliate against him or intimidate him for his actions in convincing the members of the land cooperative of which he was a leader to not give up the cooperative's lands* to the Facusse Group wanted to complete a business deal with foreign investors. (emphasis added).

The language of the BIA's terse opinion crystallizes two facts crucial to our inquiry: (1) The Facusse Group was well aware of Ontunez's sincerely held *political* beliefs regarding landownership and peasant rights, as well as his opposition to the political corruption that facilitated the group's land grab; and (2) the Facusse Group intentionally targeted Ontunez because of his *political* role of organizer, leader, influential member, and spokesman for the peasant land cooperative, not just an economically motivated farmer with a financial interest in cooperatively farming the land in question. I re-emphasize that it is not the persecutors' motivation in grabbing the land (economic) for which we test, but their motivation in persecuting the asylum seeker (here, the elite's perception of and antipathy toward, *inter alia,* Ontunez's *political* beliefs).

In combination, those two facts revealed by the BIA's statement foreclose the conclusion that the Facusse Group's attempted assassination and repeated threats on Ontunez's life were motivated solely and entirely by the group's dissatisfaction with his *economic* interests and its perception of his economic motivation for opposing the group. If the Facusse Group were only concerned about the peasants' economic stake in the Las Delicias agricultural land and their opposition to its being acquired by that group and flipped to foreign developers, the group would have had no reason to single out Ontunez and target him for intimidation or elimination. Armed with its (allegedly sham) court order, and assisted by the Honduran military in clearing the improvements from the subject tracts of land, the Facusse Group need not have bothered with Ontunez, his economic interests and beliefs, or for that matter, the economic interests and beliefs of the other peasant farmers in the cooperative. That cartel could have easily and systematically intimidated or eradicated every recalcitrant peasant who wanted to farm the property in question, including Ontunez.

Yet, the Facusse Group did not take that course. Instead, it targeted only the visible *leaders* of the cooperative, including Ontunez, thereby confirming that, at least in substantial part, it persecuted Ontunez specifically for his political motivation in leading the cooperative and his outspoken social and political beliefs with which they so strongly disagreed—*not* solely for his economic stake in the land and its continued use.

Another confirmatory example: In furtherance of its attempts to neutralize Ontunez's political power and his influence with members of the cooperative, the Facusse Group disingenuously agreed to a meeting with the leaders of the peasant land cooperative (including Ontunez), but sent to the meeting not only Group members, but also policemen and a hired hit-man who was to kill Ontunez during the course of his delivering a speech denouncing corruption in the Honduran government (politics, not economics). Luckily, Ontunez absconded; but when he returned

to Las Delicias after a brief, life-saving, self-imposed exile to his brother's house in another village, members of the Facusse Group and their private guards visited his house and again threatened him. During this encounter, members of the Facusse Group and their guards obliquely threatened Ontunez's life, informing him that he could either leave voluntarily or the Group would remove him—specifically, that he could depart "in a good way or in a bad way."

These actions by the Facusse Group prove not only that it singled out Ontunez for persecution, but that it did so not solely for his financial competition with them for the coop's property, but also for his ardent and vocal leadership of a predominantly *political* agrarian peasant land movement to which the elite were obviously opposed, and vice versa. There can be no factual dispute that the Facusse Group saw Ontunez first and foremost as a serious political threat, not just another land user reluctant to lose his own farming opportunity. Ontunez's sincerely held *political* beliefs were manifested in his efforts to organize peasant farmers and exhort them collectively to protest and oppose the government-supported "hands-off" policy of allowing the civilian elite forcibly to remove peasant farmers from the land without benefit of legal process. It is immaterial that he likely was galvanized into action initially by an *economic* concern for his farming livelihood, or that

he retained such a concern and continued to be motivated *in part* by it. Political belief as one of several that engender persecution is sufficient.

The fact that Ontunez happened to wear two hats—one as leader of the land cooperative and the other as but one among many small peasant farmers—does not automatically eradicate the substantial political nature of his leadership or relegate his advocacy, and his resulting persecution, to his personal economic stake alone. This is not a simple case of a lone farmer standing in the path of a group of businessmen because he is concerned only with the economic impact of losing his own livelihood; it is a case of a lone farmer who assumed the additional role of activist in a stereotypical socio-political *class* struggle, albeit—like most—with inseparably intertwined economic implications.

Ontunez's acts of organization and vocal advocacy were political acts which evidenced his strong political beliefs. This could not possibly have been lost on the Facusse Group. By taking a high-profile leadership role in organizing the peasant farmers and speaking out on their behalf, Ontunez sought to protect something larger—and decidedly different—than his own economic stake. He championed the right of all peasant farmers not to be forcibly—and, if necessary, violently—displaced by the elite, supported, at least indirectly, by the Honduran government.[6] This is what

---

6. *See* State Department Report on Asylum Claims and Country Conditions in Honduras:

> The most frequent claim of Honduran peasants is that their efforts to obtain land under the agrarian reform laws were thwarted by local military and police instigated by landowners. Over the years, the Government has implemented land reform programs with varying degrees of success, and the issue remains highly controversial among the landless and landowners.

> As part of its economic reform initiatives, the Government encourages domestic and foreign private investment in their agricultural sector. However, Honduran peasant groups routinely have invaded private agricultural lands. The Government, however, is on record as opposing land occupations because they are a major disincentive to agricultural investment, and uses minimal force as needed to dislodge squatters. However, one such expulsion of squatters in December 1998 resulted in the death of

evidenced his political beliefs in the eyes of the Facusse Group. That group did not perceive just his role as one of many otherwise indistinguishable economic competitors for the land as his sole motivational belief. Indeed, by becoming an outspoken activist, Ontunez not only elected to risk his own life, but at the same time made the conscious choice to forgo the truly "economic" alternative of quietly finding uncontroversial land on which to farm and subsist.

Ontunez's situation is indistinguishable from that of the union leader who was the petitioner in *Osorio v. INS*.[7] The Second Circuit concluded that his and his union's "economic" struggle was also a *political* one, finding that, even though the petitioner's union activities were grounded in his attempts to protect his (and others') economic rights, "[a]ny attempt to unravel economic from political motives is untenable."[8] In reaching its conclusion under the facts of that case, the Second Circuit relied on the United Nations Handbook on Procedures and Criteria for Determining Refugee Status, which stated:

> The distinction between an economic migrant and a refugee is, however, sometimes blurred in the same way as the distinction between economic and political measures in an applicant's country of origin is not always clear. Behind economic measures affecting a person's livelihood there may be racial, religious, or political aims or intentions directed against a particular group.
>
> . . .
>
> [W]hat appears at first sight to be primarily an economic motive for departure

may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves.[9]

Like the beliefs of the union leader in *Osorio*, it was, in substantial part, Ontunez's socio-political beliefs regarding corruption in the Honduran government and violation of the human rights of peasant farmers vis-à-vis the civil elite that subjected him to the serious—even life threatening—persecution by that same elite. And, indisputably, it is the prospect of the elite's retaliation in recognition of—and opposition to—his genuinely held *political* beliefs that forms the very reasonable basis of Ontunez's well-founded fear of persecution, should he be forced to return to Honduras.

To illustrate this point further, I offer the following hypothetical example: Suppose that Ontunez, rather than being a peasant farmer himself, had been an economically self-sufficient, Honduran citizen who was ideologically opposed to the elite-initiated, government-supported, displacement of peasants from untitled agricultural land. To advocate his pro-democracy position, our non-farming ideologue helps found an organization of peasant farmers to oppose the tactics and goal of the Facusse Group, and becomes this underclass organization's spokesman. Suppose further that the Facusse Group threatens our economically disinterested citizen and hires hit men to assassinate him while the local police turn their backs, precisely

---

one activist who had threatened police personnel with a machete.

**7.** 18 F.3d 1017 (2d Cir.1994).

**8.** *Id.* at 1029.

**9.** The U.N. Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees at ¶¶ 63–64 (cited by *Osorio,* 18 F.3d at 1029).

what happened to Ontunez in real life, as credited by the IJ.

As the hypothetical Ontunez of my illustration has no personal economic stake in the land itself, the IJ and the BIA could not possibly reach any conclusion but that he was persecuted because of his persecutors' perception of his political beliefs. Yet the only difference between the hypothetical Ontunez and the real-life Ontunez is the fact that the real Ontunez also happens to farm some of the land sought by the elite and thus has a personal economic stake in the outcome of the dispute.

My obvious point is that it is both incongruous and contrary to our case law for the IJ or the BIA—or this court—to conclude that, simply because an asylum seeker happens to have some personal economic stake in the object of a mixed-motive class struggle, he does not also have, or cannot also hold, strong *political* beliefs regarding the dispute. It is equally illogical to conclude that the presence of an economic interest adverse to that of his persecutors precludes the refugee's political beliefs and his leadership role in the voicing of those beliefs from being reasons that he is singled out for persecution and for which he thus harbors a reasonable fear that he would again be persecuted if he were forced to return. This is a quintessential mixed motive case.

The case relied on by the government and the panel majority, *Cuevas v. INS*,[10] is easily distinguished from this one. In *Cuevas*, a group of Philippine landowners became involved in a dispute with squatters on their land. The landowners claimed that the squatters were part of the military branch of the Philippine's Communist Party and that the squatters threatened the landowners with death if

they refused to relinquish the land. The Seventh Circuit determined that the land dispute there was purely an economic one between private parties and had no political import. In doing so, however, the court emphasized that the *Cuevas* petitioners could not identify (1) the source of threatening phone calls, (2) the person who killed their relative, or (3) the armed men who badgered them. Thus, they failed to link their persecution to the alleged persecuting group. The *Cuevas* court also noted that the petitioners did not attempt to avail themselves of Philippine legal procedures and that the "real reason for petitioner's hasty departure from the Philippines is probably found ... [in] the Administrative Record: the entire family of petitioner ... lives in Chicago." [11]

In contrast, Ontunez has credibly and precisely identified the perpetrators of the various threats and attacks against him. He has also demonstrated that he repeatedly attempted to enlist assistance from local Honduran government and law enforcement officials to aid his cause and remedy his persecution—but to no avail. And there is no evidence to suggest that his fleeing to the Unites States was based on selfish or ulterior motives—personal financial gain, in particular—unrelated to his position as political activist and spokesman for the agrarian reformers of the cooperative.

One final point of error: After having somehow decided that Ontunez's persecution was *solely* economic, the BIA failed to address the question whether the class of "activist agrarian cooperative leaders" constitutes a "particular social group" for purposes of asylum law. Instead, the BIA concluded, without further analysis, that Ontunez had failed to establish a nexus to

---

**10.** 43 F.3d 1167 (7th Cir.1995).

**11.** *Id.* at 1171.

any of the grounds specified in the asylum statute. Yet, as verbalized by the BIA itself in *Matter of Acosta*,[12] to establish persecution sufficient to garner asylum, a petitioner can show (1) his membership in a particular societal group and (2) persecution directed toward the group:

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or *land ownership*. The particular kind of group characteristic that will qualify under this construction remains to be *determined on a case-by-case basis*. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.[13]

Even though in *Osorio* the Second Circuit did not extensively address the "identifiable group" issue because it decided that the petitioner had established eligibility for asylum on other grounds, the court observed that, collectively, "union leaders" did in fact constitute a particular social group that was persecuted in Guatemala. Here, depending on the extensiveness of the government-endorsed economic development schemes, "agrarian cooperative leaders" almost assuredly did—and still very well might—constitute a persecuted social or political group.

I would hold that the BIA erred as a matter of law when it failed to address the "identifiable group" issue. If nothing else, this requires a remand for further deliberation, as we required in *Rivas–Martinez*.

To recap, Ontunez's sole burden here was to establish that a reasonable fact finder would be compelled to conclude that his persecution was based *at least in part* on his genuinely held *political* beliefs *as seen through the eyes of his persecutors*.[14] Ontunez's fully credited and uncontradicted testimony proves beyond cavil that it was his organization, leadership, and advocacy of the peasant land cooperative that caught the attention of a powerful civilian elitist group (with its close family, social, and political class ties to the government and its ability to enlist the aid of government and police officials) and convinced this same group that Ontunez's demonstrated political belief—clearly contrary to their own—posed a threat. And it was the Facusse Group's concerns about Ontunez's political beliefs that prompted (or at least contributed to) that group's decision to subject him to life-threatening consequences. That his persecutors were motivated "at least in part" by Ontunez's political beliefs, which they viewed (correctly) as anathema to their own, is wholly inescapable. That his persecutors also perceived Ontunez to hold economic beliefs opposed to theirs is wholly immaterial.

Because I am convinced that, under these facts, separating and conflating the political, social, and economic motives of both Ontunez and his persecutors is a misdirected, impractical, unrealistic—and, ultimately, inhumane—exercise in futility, and

---

**12.** *Matter of Acosta,* 19 I&N Dec. 211, 1985 WL 56042 (BIA 1985).

**13.** *Id.* at 233 (BIA 1985) (emphasis added) (holding, however, that membership in a taxi cooperative, based on the facts of the case, did not constitute a particular social group).

**14.** *See INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Rivas–Martinez v. INS,* 997 F.2d 1143 (5th Cir.1993).

that he successfully demonstrated that his persecutors' perception of his political beliefs substantially motivated them to torture him—and would do so again if he returned—I respectfully dissent from the panel majority's rejection of Ontunez's petition to review and reverse the BIA's denial of asylum.