United States Court of Appeals,

Fifth Circuit.

No. 92-4849.

Reyna De La Paz RIVAS-MARTINEZ, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

Aug. 18, 1993.

Petition for Review of an Order of the Immigration and Naturalization Service.

Before GOLDBERG, GARWOOD, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this immigration case, Petitioner Reyna De La Paz Rivas-Martinez (Rivas) appeals the Board of Immigration Appeals' (BIA) denial of her application for asylum, which had been granted by the Immigration Judge (IJ). Rivas insists that the BIA erred in concluding that she had not demonstrated a well-founded fear of persecution by El Salvadorean guerrillas based on her political opinion. As both the IJ and the BIA failed to apply correctly the test for asylum eligibility established in *INS v. Elias-Zacarias,*[1] neither tribunal adequately reviewed the sufficiency of Rivas's proof. Accordingly, we reverse and remand this case to the BIA, either to be reconsidered by the BIA or—better yet—to be remanded by it to the IJ, for proceedings consistent with this opinion.[2]

I

FACTS AND PROCEEDINGS

Rivas, a citizen of El Salvador, entered the United States without inspection, in violation of § 241(a)(1)(B) of the Immigration and Nationality Act (INA). In her hearing before the IJ, Rivas admitted her deportability but sought asylum and withholding of deportation. She also declined to designate El Salvador as the country of deportation should deportation become necessary. The IJ

---

[1]--- U.S. ----, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

[2]*Elnager v. INS,* 930 F.2d 784, 787 (9th Cir.1991) (refusing to order BIA to remand to IJ: "Although the BIA has the discretionary power to remand a case, 8 C.F.R. 3.1(d)(2), the federal regulations and case law do not require that it do so").

designated El Salvador as the country of deportation on his own motion.

Proceeding pro se, Rivas explained her situation to the IJ. In 1988 Rivas, then living with her mother, was approached by members of the guerrilla faction, FMLN. They demanded food and assistance in disseminating anti-government propaganda. Rivas refused to aid the guerrillas, for which they threatened her, warning that if she failed to cooperate next time she would "have to leave or something was going to happen."

To divert these threats, Rivas's common-law husband agreed to assist the guerrillas in distributing their propaganda.[3] He was killed several months later in cross-fire between government troops and the guerrillas forces, and, within days thereafter, the guerrillas returned to Rivas and again demanded that she assist in their cause. This time she created and expressed an impromptu excuse: She could not help the guerrillas because she was now a single parent of a small child who needed her constant care. But the guerrillas renewed their threats and gave her 48 hours to decide, implicitly rejecting her expressed reason. Without waiting for that deadline, Rivas left, joining her mother who had earlier fled the region.

Following Rivas's move, there was no immediate contact from the guerrillas. Several months passed, then a letter from the FMLN was received at Rivas's mother's address. The letter was addressed to Rivas's brother, a member of the government forces, and instructed him to assist the guerrillas or suffer the consequences. Afraid that the guerrillas would discover her presence at that address, Rivas fled to the United States.

At the IJ hearing, Rivas testified that she did not assist the guerrillas because she did not believe in their political goals, but instead was a strong supporter of the government. Moreover, she blamed the rebels for killing innocent people and destroying El Salvador's economy. Understandably, however, she never communicated these "political opinions" directly to the guerrillas.

The IJ granted Rivas's application for asylum, expressly finding that Rivas was a credible witness and that her testimony was "forthright, specific, consistent and plausible." In so doing, however, the IJ rejected the applicability of "forced conscription cases," an indirect reference to

---

[3]Apparently, Rivas' mother also bowed to the guerrillas' threats by providing them with food.

*Elias-Zacarias,* because the guerrillas sought to conscript Rivas to disseminate information, not to fight in combat.

On appeal, the BIA reversed, vacating the IJ's decision, denying Rivas's application for asylum and for withholding of deportation, and granting her thirty days voluntary departure to exit the United States. The BIA did not reject the IJ's credibility finding and it did not dispute Rivas's testimony that her refusal to assist the guerrillas was based on her political opposition to their cause. And the BIA correctly rejected the IJ's attempt to distinguish *Elias-Zacarias,* which case the BIA found applicable.

Unfortunately, however, when the BIA purported to apply the standard, it did so incorrectly. In so doing the BIA too improperly applied that test: It first observed that "the respondent indicated that she never told the guerrillas that she opposed them. Instead, she indicated to them that her refusal to assist them was due to her young child"; then, in a leap of logic, concluded that "any action taken against the respondent would be due to a reason apart from her political opinion and not within the purview of the protection offered by the Act."

II

ANALYSIS

A. *Standard of Review*

The parties dispute the applicable standard of review. Rivas insists that the BIA's conclusion that she refused to cooperate with the guerrillas for nonpolitical reasons is a finding of fact to be reviewed to determine if it is supported by substantial evidence. The flaw in this argument is, of course, that the BIA simply never made such a finding. In her reply brief, Rivas argues that the BIA altogether failed to consider her testimony, which she claims proves that the guerrillas knew of her political opposition and persecuted her because of it (or would have if she had returned). To the contrary, the BIA did acknowledge her testimony but found it insufficient to meet her proof obligation.

A point on which Rivas and the BIA do agree, though, is that Rivas's eligibility for asylum is governed by *INS v. Elias-Zacarias.*[4] In that case, the Supreme Court specifically stated that "to

---

[4]--- U.S. at ----, 112 S.Ct. at 812.

obtain judicial reversal of the BIA's determination, [the alien] must show that the evidence he presented was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution."[5] But, this standard of review implicitly presumes that in the BIA decision being reviewed the factors comprising *Elias-Zacarias* 's asylum eligibility test have been applied. As we find here that the BIA's misunderstanding of *Elias-Zacarias* pretermitted its correct application of the standard, an error the BIA shared with the IJ, this standard of review does not apply. Instead, we review de novo the BIA's interpretation of *Elias-Zacarias.*

"This court is authorized to review only the order of the [BIA].... Consequently, the errors or other failings of the [IJ] are considered only if they have some effect on the [BIA's] order."[6] In the instant case, the IJ's failure to apply the *Elias-Zacarias* standard result ed in an evidentiary proceeding geared only towards Rivas' general status as a *refugee.* The IJ failed to adduce facts regarding her eligibility for asylum as a potential conscript. Consequently, the IJ's error clearly affected the BIA's decision, as the IJ's approach determined the nature of the evidence adduced. In turn, that produces our view that additional evidentiary proceedings at the IJ level may be necessary.

B. *Holding of* Elias-Zacarias

*Elias-Zacarias* involved the asylum application of a native of Guatemala who fled his country to avoid conscription by Guatemalan guerrillas. Elias-Zacarias admitted in the IJ hearing that he had declined to join the guerrillas because he feared government retribution—unlike Rivas whose subjective reasons were political, albeit they were held sub silentio. Also unlike Rivas, Elias-Zacarias's requests for asylum and withholding of deportation were denied by the IJ and that denial was affirmed by the BIA.

On appeal, the Ninth Circuit reversed, ruling that in and of themselves coercive acts of conscription by non-governmental groups constitute political persecution. After granting certiorari, the Supreme Court reversed the Ninth Circuit in a two-part holding. The Court held first that in and of itself coercive conscription does *not necessarily* constitute "persecution on account of ... political

---

[5]*Id.* at ----, 112 S.Ct. at 817.

[6]*Adebisi v. INS,* 952 F.2d 910, 912 (5th Cir.1992).

opinion" under § 101(a)(42) of the INA. The Court reasoned that to rule otherwise would place the emphasis on the political motives *of the persecutor.* Instead, the Court requires the alien to show that he refused to participate for his own political reasons. In the second part of the holding, the Court ruled that an alien seeking asylum on these grounds must prove by "*some* evidence,"[7] direct or circumstantial, that "he has a "well-founded fear' that the guerrillas will persecute him *because of* that political opinion, rather than because of his refusal to fight with them."[8]

C. *Proving the Requisite Persecution*

Although *Elias-Zacarias* clearly sets forth the elements that an alien must prove to qualify for asylum in a forced conscription case, the Court leaves largely unanswered the related questions (1) *how* is an alien to prove these elements and (2) *what* burden of proof must the alien meet. Undeniably, an alien faces a very difficult task in proving that the guerrillas knew of his political opinion and persecuted him (or, upon his return will likely persecute him) because of that opinion. The only guidance *Elias-Zacarias* give on this issue is that the alien must introduce "*some* evidence of [the guerrillas' motive], direct or circumstantial."[9]

1. *Methods of Proving Requisite Persecution*

Before remanding for a determination *whether* Rivas has met the requirements articulated in *Elias-Zacarias,* we must first explain *how* an alien may prove the requisite persecution, an issue (as noted) not fully fleshed out in *Elias-Zacarias.* Unfortunately, the BIA in the instant case chose a method of analysis that is reduced to absurdity when taken to its logical conclusion. The BIA stresses that Rivas informed the guerrillas that the reason she could not assist them was her need to care for her young daughter. In its flawed syllogism, the BIA then makes an impermissible jump to conclude that, given Rivas's non-political proffered excuse, the guerrillas could not have known of her political opposition and, therefore, could not be expected to persecute her for her opinion.

We reject this postulate for two reasons. First, the BIA's reasoning implicitly imposes an

---

[7]*Id.* --- U.S. at ----, 112 S.Ct. at 817.

[8]*Id.* at ----, 112 S.Ct. at 816.

[9]*Elias-Zacarias,* --- U.S. at ----, 112 S.Ct. at 817.

unrealistic requirement on entitlement to asylum: That an alien must foolhardily court death by informing armed guerrillas to their faces that she detests them or their actions or their ideologies—or all of the above. Otherwise, under the BIA's reasoning, one who tries to avoid cooperation by offering some benign pretext in an effort to avoid cooperating without antagonizing her ruthless recruiters, will effectively be barred from proving that the guerrillas nevertheless knew of her political opposition. Obviously, any person who is not bent on martyrdom is likely to attempt to defuse or avoid the potentially deadly situation by proffering a convincing but non-offensive excuse—here, the sympathetic plea of a recently widowed mother who alone must now care for her child. For the BIA to invent such a preclusive evidentiary rule is to ignore reality in general and reasonable human behavior in particular.

Second, the BIA's declaration is a classic non-sequitur. Simply because Rivas proffered a non-political reason to the guerrillas, it does not necessarily follow that they *believed* her. More significantly, however, the BIA's "logic" impliedly presupposes that the guerrillas rely solely on the declarations of the persons they intend to conscript. The BIA thereby excludes from consideration whether the guerrillas had acquired or would acquire other information through their own intelligence network, through informants, or through the revelations of the victims of their torture. Given the dire consequences of forced conscription, the guerrillas must have regularly encountered innumerable individuals who attempted to avoid service without intentionally enraging the guerrillas. Likewise, the guerrillas certainly must have developed a strong skepticism of such banal excuses.

Moreover, there is absolutely no support in *Elias-Zacarias* for the BIA's reasoning. Nowhere does *Elias-Zacarias* reject the common sense approach which allows immigrants to demonstrate that, irrespective of non-political excuses voiced to the conscriptors in face-to-face encounters, those conscriptors either knew or would learn of the political opposition of the potential conscript by extraneous evidence, e.g., her working for the opposition, her utterances against the guerrillas, or the affiliation of her family members with the government. Moreover, *Elias-Zacarias* specifically provides that aliens who seek asylum can prove, either by direct or circumstantial evidence, that the guerrillas persecuted or will likely persecute them because of the alien's political opinion.

2. *Sufficiency of Rivas's Proof*

Without trying to establish affirmatively precisely what methods of proving the requisite persecution are available to aliens like Rivas, we have concluded that these methods are not so prohibitively limited as the BIA suggests. The question still remains, however, whether here Rivas has satisfied the requirements of *Elias-Zacarias* that she prove the kind of persecution that justifies asylum, i.e., persecution for *her* political opinion which is known by the persecutors. As it incorrectly applied *Elias-Zacarias,* the BIA never reached—or, more accurately, skipped over—the question whether Rivas satisfactorily proved that she refused to cooperate on the basis of her political opinion and that the guerrillas likely knew that. Consequently, we must remand to the BIA for an evaluation of Rivas's proffered evidence or remand to the IJ for such a finding. Absent such a determination, we cannot possibly conduct the review required in *Elias-Zacarias.*

We remind the BIA, however, that *Elias-Zacarias* requires the asylum seeker to adduce "some evidence, direct or circumstantial," that (1) her opposition was motivated by her political opinions; (2) her political opposition was known to the guerrillas and (3) that they persecuted her, or likely would do so upon her ret urn, because of that opinion. In the first proceeding, the IJ expressly found Rivas a credible witness who testified, inter alia, that her refusal to assist the guerrillas was based on her political beliefs. The INS has never challenged this finding. Moreover, Rivas testified that her beliefs were well known to the guerrillas. This constitutes "some evidence," although it remains for the BIA (or the IJ if remanded) to determine whether it is sufficient.

Considering the IJ's mistaken belief that *Elias-Zacarias* did not apply due to Rivas' non-combat forced conscription, this evidence was adduced with an eye towards proving Rivas's general status as a *refugee,* and did not answer the questions set forth in *Elias-Zacarias* and reiterated here. Accordingly, the BIA may find further evidentiary proceedings necessary for Rivas to present evidence on all three elements of the *Elias-Zacarias* standard.

III

CONCLUSION

Based on the combined effect of the failures of the IJ and the BIA to apply correctly the

standard for asylum eligibility established in *Elias-Zacarias,* there has been no competent determination, one way or the other, whether Rivas has met the elements set forth in that case. Accordingly, we remand to the BIA for proceedings consistent with this opinion, particularly our discussion of *Elias-Zacarias.* Specifically, the BIA is directed to reconsider this case, or remand it to the IJ for reconsideration, in either forum applying the *Elias-Zacarias* standards in the manner outlined herein, including the possibility of a supplemental evidentiary hearing if deemed necessary.

For the foregoing reasons, and without implying or predicting the ultimate result of this case, the decision of the BIA is REVERSED and REMANDED.