REVISED SEPTEMBER 9, 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 00-60650

---

SANTIAGO NAHUN ONTUNEZ-TURSIOS,

Petitioner,

versus

JOHN ASHCROFT, U.S. ATTORNEY GENERAL,

Respondent.

---

Petition for Review of an Order of the
Board of Immigration Appeals

---

August 13, 2002

Before GARWOOD, WIENER and CLEMENT,[1] Circuit Judges.

GARWOOD, Circuit Judge:

Honduran citizen Santiago Nahun Ontunez-Turcios appeals the denial of his application for asylum and withholding of removal under section 241(b)(3) of the Immigration and Nationality Act

---

[1] Judge Edith Brown Clement participated by designation in the oral argument of this case as a United States District Judge for the Eastern District of Louisiana. Since that time she has been appointed as a Fifth Circuit Judge.

("Act") and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention"), arguing that his efforts as part of a Honduran land collective make him a "refugee." The immigration judge and Board of Immigration Appeals held that Ontunez's evidence only demonstrated that his land conflict was private and economic in nature, that any persecution of him was not shown to have been on account of his political opinion or membership in a particular social group, and therefore he was not entitled to asylum or withholding of removal. Because Ontunez has not presented evidence that compels the opposite result, we affirm.

### Background

Honduran land reform laws under certain circumstances allow peasant farmers–"campesinos"--to gain ownership of land lacking a proper legal title by cultivating it as part of an agrarian reform plan. *See* Steven E. Hendrix, *Property Law Innovation in Latin America With Recommendations*, 18 B.C. INT'L & COMP. L. REV. 1, 38 (1995). Their efforts, however, are sometimes opposed by business or landowner interests with plans for private agricultural or other investment. When legal methods fail the campesinos, they sometimes occupy private agricultural land illegally and the government evicts them by such minimal force as is necessary. *See* United States Department of State, *Honduras: Profile of Asylum Claims & Country Conditions*, January 1999, at 5-6. Although Honduras has

elected five presidents in a row through generally fair and democratic elections, the economic and official elite still possess "considerable impunity." *See id*. at 2; United States Department of State, *Honduras Country Report on Human Rights Practices for 1998*, at 1. Conditions in Honduras were vastly worsened in October 1998, when Hurricane Mitch devastated the country. From out of this difficult situation, Ontunez brings his request for asylum and withholding of removal.

The factual background of this case comes almost exclusively from Ontunez's own testimony, both at the hearing before the immigration judge and in his application for asylum. Ontunez testified that in April 1994, he moved to the city of La Ceiba on the northern Caribbean coast of Honduras with his live-in companion and his son. He worked as a mechanic and joined with other campesinos who wanted to cultivate an area in La Ceiba called Las Delicias. A woman in the town claimed to have title to Las Delicias through a document she had never registered; she executed a power of attorney in favor of the campesinos but refused to register her legal title because her husband had been murdered in 1965 and she feared reprisals against her son. Each family began cultivating an area of sixty by forty meters, and they created a cooperative called the Foundation for the Betterment of Las Delicias for the purpose of acquiring legal title to the land. Ontunez was "First Speaker" for the Foundation, which meant that he

3

read the minutes at meetings and encouraged the other campesinos to remain united in the pursuit of their goal.

In 1996, a group of businessmen challenged the Foundation's right to the land. This group consisted of five local "landlords," including Eugenio "Henyo" Varela ("Varela") and Mario Melgar ("Melgar"). Ontunez alleges that Melgar is an attorney who represents Mario Facusse, the majority stockholder of a prominent Honduran business[2] and the nephew of Carlos Roberto Flores Facusse, President of Honduras since 1998.[3] The landlords[4] claimed they had legal title to Las Delicias and made plans to sell it to Korean investors.

In late 1996, the landlords threatened to drive the Foundation's members from Las Delicias. In 1997 a judge ordered Las Delicias cleared, apparently at Melgar's request, despite Ontunez's allegations that the landlords produced no evidence of title justifying the legal action. The police enforced the order

---

[2] In his asylum application, Ontunez calls the corporation "Gigante." At his hearing, the court reporter was unable to understand the name of the corporation but transcribed it phonetically as "Essay."

[3] The INS did not challenge this assertion or produce evidence to the contrary. Though there are indications that Mario Facusse may be a cousin to the Honduran president, not a nephew, we will consider the evidence as it stood before the BIA. Similarly, we will not consider indications that Mario Facusse may belong to a different political party than Flores and may openly oppose him.

[4] The briefs for the appellant call these businessmen "The Facusse Group," although Ontunez did not use that name. We will use Ontunez's nomenclature, "the landlords."

4

by removing the campesinos from the land and completely destroying their homes, but the Foundation returned to Las Delicias and rebuilt. At around this time, Foundation treasurer Jesus Pascual was killed. While Ontunez blames the landlords, he admitted that there was no evidence of who committed the crime.

The landlords then obtained a "new order" of some kind and offered to settle the legal title issue with the campesinos for 1,000 lempiras per plot. The Foundation asked for a hearing before the mayor so that they could determine whether the landlords had any valid claim to the land justifying the payments. Mayor Marjorie Dik declined to hold the hearing. Ontunez alleges that while Dik had generally supported the Foundation because of its work building a school, she feared reprisals from Varela if she declared the land belonged to the cooperative. In his application for asylum, Ontunez intimated that Dik left office in 1998 because of this fear.[5]

In 1998, Gonsalo Rivera O'Campo was elected mayor of La Ceiba and the Foundation again pursued a hearing to negotiate the question of land title. The parties expected Governor Adalberto Giron Romero to attend the March 1998 meeting, but he ultimately refused. Ontunez alleges Giron abstained because he believed the landlords had no valid title, making the negotiations illegitimate.

---

[5] However, Ontunez testified that Dik served her full term as Mayor. Perhaps his application intended to suggest that her fear of reprisals caused her to not seek re-election.

Ontunez also alleged his belief that Giron was subsequently removed from office by President Flores because of his support for the Foundation.[6]

After the proposed O'Campo hearing failed in March 1998, the Foundation and the landlords agreed to come together at a public meeting to discuss the offered settlement. The Foundation arrived first, and Ontunez began denouncing official corruption through an amplified microphone. At least four of the landlords[7] arrived with Marcos Puerto ("Puerto") and two Honduran police in their company. When the men were about 25 meters away from Ontunez, Varela nodded to Puerto, who pulled out an AK-47 rifle and shot Foundation guard Juan Mejia. While Ontunez took cover, the landlord group returned to their car and left.

Dissatisfied with the La Ceiba police's investigation into the murder and concerned for their safety, Foundation members looked for Puerto themselves. In April, they received a tip that Puerto was located on the property of Mario Facusse in the city of San Pedro Sula. The Foundation told the Department of Criminal Investigations of his location, and the San Pedro Sula police

---

[6] Ontunez's testimony was inconsistent on this point; twice he claimed Giron was removed from office prematurely and once he testified that Giron merely left at the end of his term.

[7] Ontunez does not list Melgar as being among the landlord group, although he appears to suggest that they used Melgar's car to drive to the meeting. At another point, however, Ontunez blamed Melgar for bringing the police to the meeting, and attributes to Melgar a statement implying that he was in the car when the assassin got in.

6

arrested Puerto. Ontunez testified that the president of the Foundation, Rosa Mejia, told Ontunez that she had been present during Puerto's interrogation by the police and that Puerto had then admitted that the landlords hired him to assassinate Ontunez and another man, but that he shot Juan Mejia by mistake. Ontunez speculated that that error came from Puerto's misinterpretation of Varela's nod toward the Foundation members. Puerto was prosecuted for his crime, convicted, and incarcerated.

In October 1998, Ontunez went to the land title office in La Ceiba, where he met and confronted Melgar. Both men were apparently searching for title records for Las Delicias. Ontunez accused Melgar of being an accomplice to the death of Mejia, while Melgar apparently denied the allegation and claimed that he was afraid of the assassin as well. Ontunez's search of the land records turned up no registered title to Las Delicias. It was in this month that Hurricane Mitch hit Honduras and devastated the nation, destroying nearly everything in Las Delicias. Among the items destroyed were the Foundation's collection of public documents regarding the landlords. Ontunez testified that he had been to several cities gathering the criminal histories of the landlords and their employees as well as records of the complaints filed against them.

In April 1999, six months after the confrontation with Melgar, the landlords or those Ontunez thought to be acting for them came

7

armed to Ontunez's home and threatened his life. Ontunez feared for his safety and fled to his brother's house in San Pedro Sula, leaving his family behind. By the end of July, Ontunez missed his family and returned to Las Delicias, despite his fear of being killed. When he returned, two of the landlords and their guards came to Ontunez's house with weapons and ordered him to leave town within one month and fifteen days or they would remove him from Las Delicias, either in "a good way or in a bad way."[8] An unidentified young man was with them, who stared at Ontunez during the meeting. After they left, a neighbor told Ontunez that the young man had said "this deer will not escape me" or words to that effect. Ontunez took this as a death threat and described the young man as a paid assassin, but admitted that he had no direct knowledge of the young man's motive. At the urging of his mother, Ontunez left his family behind and fled Honduras. He first entered Guatemala legally, and then traveled to Mexico and crossed the Rio Grande river near Hidalgo, Texas. He was apprehended by the Border Patrol while attempting to evade the Falfurrias checkpoint on September 19, 1999.

Ontunez conceded his removability at a hearing on October 15,

---

[8] Ontunez's story regarding these two confrontations is frequently confusing, especially comparing his application for asylum and his oral testimony. This version of events is the one that best fits Ontunez's various assertions and his clarifications in cross-examination.

1999[9] and applied for asylum.  At his hearing before the immigration judge on December 15 and 20, 1999, Ontunez offered the above testimony and some documents.  Among these documents was a letter from Raul G. Tovar Ramos, present governor of Atlantida, which attests to Ontunez's good character and corroborates that Ontunez's life was threatened by "various unscrupulous persons and neighbors" in La Ceiba.  Governor Tovar also attests that Ontunez was a victim of Hurricane Mitch.  In another document, Honduran attorney Paul Tovar Vargas avers that Ontunez has charged "several individuals of dubious reputation" in La Ceiba of threatening his life in an attempt to take his land, and that this was the reason he emigrated to the United States.

The immigration judge noted that an application for asylum should also be construed as an application for withholding of removal under both the Act and the Convention, and then denied Ontunez relief on all three counts.  Despite pointing out several inconsistencies in Ontunez's testimony, the immigration judge found his testimony generally credible.  Nevertheless, the judge held that Ontunez was not a "refugee" as defined in 8 U.S.C. § 1101(a)(42) because his situation did not arise "on account of" any of the five enumerated motives for the claimed persecution: "race, religion, nationality, membership in a particular social group, or political opinion."  Ontunez failed to carry his burden, the

_____

[9]    The transcript is dated April 15, 1999, but from other documents it seems clear that "April" is an error.

9

immigration judge held, because his conflict with the landlords was not shown to arise other than solely from a private fight over land. The landlords did not act against Ontunez because of Ontunez's political opinions or membership in a particular social group. Accordingly, the judge denied Ontunez's requests for asylum and withholding of removal under the Act. The judge also held that Ontunez had not shown he would be subject to torture upon return to Honduras and thus denied Ontunez's claim under the Convention.

The Board of Immigration Appeals acknowledged that Ontunez had demonstrated that the landlords possessed both the economic desire to sell Las Delicias to foreign investors and a willingness to threaten those who got in the way, but concurred with the immigration judge that Ontunez had not shown a nexus between the persecution and one of the persecutors' motives enumerated in the Act. The BIA then discussed the Convention's requirement of a government connection to the feared torture and held that Ontunez was not entitled to protection under the Convention because he had not shown that a government official would instigate torture or acquiesce to it. The BIA dismissed Ontunez's appeal and he timely appealed to this court.

### *Discussion*

*I. Legal Error in the Asylum Claim*

Ontunez first asserts on appeal that the BIA applied an incorrect legal standard to his request for asylum. We review the

10

BIA's conclusions of law *de novo*.  *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997).  We review the decision of the BIA, and reach the underlying decision of the immigration judge only if that decision has some impact upon the BIA's opinion.  *Id*.

Section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a), grants the Attorney General the discretion to permit asylum to an alien who is a "refugee," a term which is defined as an alien who is unable or unwilling to return to his or her country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A).  Ontunez's legal error appeal concerns the "on account of" language, which requires the alien to prove some nexus between the persecution and the five protected grounds.  *See generally INS v. Elias Zacharias*, 112 S.Ct. 812 (1992).  Ontunez claims that the BIA looked at his evidence only as proof of economic conflict without considering that it also demonstrates a political struggle.  Therefore, Ontunez argues, the BIA applied too stringent a standard and effectively required him to demonstrate that his persecution was *primarily* on account of a protected ground rather than merely that his persecution had *some* nexus to a protected ground.

Ontunez relies upon *Rivas-Martinez v. INS*, 997 F.2d 1143 (5th Cir. 1993), a case in which the BIA incorrectly applied an "either-

11

or" analysis to the "on account of" requirement. In *Rivas-Martinez*, El Salvadorean FMLN guerillas ordered Rivas to help them in their struggle against the government, but she refused. *Id*. at 1145. She told the guerillas she could not help them because she was a widowed mother and had to give constant care to a small child; she actually refused because she strongly supported the government. *Id.* When the guerillas refused to accept her proffered reason, she chose to flee rather than support the FMLN. *Id.* While the immigration judge granted her asylum, the BIA reversed because it reasoned that *Rivas* had given a non-political reason for her refusal and thus logically could not have been persecuted "on account of" a political opinion as required in the Act. *Id.* On appeal, this court reversed the BIA and remanded for reconsideration. Without examining the sufficiency of Rivas's evidence, we found that the nexus requirement is not an "either-or" proposition. Instead, the proper standard allows the applicant's testimony to prove the necessary persecution even though other evidence fails to advance her cause. Thus, while Rivas offered a non-political excuse to the guerillas, it was error for the BIA to categorically prevent her from showing political persecution through *other evidence*. After all, the *guerillas* may have known her statement was false because they had other knowledge of her politics. *Id*. at 1147-48. Accordingly, we remanded to the BIA for reconsideration. *Id*.

12

It is true that *Rivas-Martinez* counsels that the applicant must merely demonstrate some nexus between persecution or a well-founded fear of persecution and one of the conditions enumerated in 8 U.S.C. § 1101(a)(42), notwithstanding evidence that persecution may have also been based upon other reasons. The BIA correctly applied this standard to Ontunez's case, however. The BIA stated in its opinion:

> "Regardless of the fact that the Facusse Group may have been aware of the respondent's claimed political opinion, we find that based on the record before us, the respondent failed to establish that the Facusse Group's alleged destruction of his home and crops and threats to kill him are *in any way related to* his political opinion, rather than to the Facusse Group's desire to retaliate against him or intimidate him for his actions in convincing the members of the land cooperative of which he was a leader to not give up the cooperative's lands to the Facusse Group, which land the Facusse Group wanted to complete a business deal with foreign investors." (emphasis added)

Unlike *Rivas-Martinez*, in which the BIA *clearly* stated an incorrect legal standard, the BIA appears to have stated and applied the correct legal requirement. The BIA asked the correct question: does the evidence demonstrate persecution or fear of persecution "on account of" political opinion? They state the standard as "in any way related to," which admittedly is not a word-for-word restatement of the standard. Yet, it demonstrates that the BIA understood the necessity of a nexus and found that no nexus existed, thus arguably construing the proper legal standard *even more generously in Ontunez's favor*. We therefore do not read

13

the BIA's opinion as holding that Ontunez could never prove a nexus between his political opinion and persecution by the landlords because his evidence demonstrates an economic motive. Instead, the BIA simply held that Ontunez's evidence showed no motive of the persecutors other than a private, economic one and failed to establish persecution to any extent on account of or motivated by Ontunez's political opinion or membership in a particular social group. The BIA did not disregard mixed motive; Ontunez failed to meet his burden of proof of a mixed motive. *Rivas-Martinez* therefore does not apply.[10]

This court addressed similar language in *Girma v. INS*, 283 F.3d 664 (5th Cir. 2002). In *Girma*, the petitioner claimed that the INS had failed to properly comprehend the "mixed motive" doctrine, erroneously requiring Girma to exclude all possibilities other than the protected factors. *Id*. at 667. Girma relied heavily on the BIA's use of the words "rather than," *id*. at 668, which suggested the either-or dynamic forbidden in mixed motive cases. After deciding that other portions of the opinion showed the BIA had in fact applied the mixed motive standard correctly, this Court stated that:

---

[10] Moreover, in *Rivas-Martinez* the guerillas who threatened Rivas were an overtly political anti-government guerilla force, which immediately suggested a nexus between Rivas's political stand and the actions of the FMLN. Here, Ontunez's enemies are not shown to have any political agenda. This is another distinction between Ontunez's case and Rivas's.

14

> The BIA's use of the phrase 'rather than,' was not an expression of a mutual exclusivity standard between protected and unprotected grounds but an explanation of its findings concerning the sufficiency of the evidence relative to multiple possible motivating grounds, two of which are protected and one which is not. *Id.*

We apply the same analysis and reach the same conclusion. While Ontunez strenuously disagrees with the BIA's conclusion, and while the BIA used language more equivocal than would be ideal, Ontunez has not shown that the BIA misunderstood the standard to be applied to his case. Ontunez's claim of legal error must fail, and accordingly we will affirm the BIA's decision.

*II. Factual Sufficiency in the Asylum Claim*

Ontunez next argues that the BIA erred by finding his evidence insufficient to support a claim of persecution on account of political opinion or membership in a particular group. This court reviews "factual findings by the Board to determine if they are supported by substantial evidence in the record." *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997). "The substantial evidence standard requires only that the Board's conclusion be based upon the evidence presented and be substantially reasonable." *Silwany-Rodriguez v. INS*, 975 F.2d 1157, 1160 (5th Cir. 1992) (quoting *Rojas v. INS*, 937 F.2d 186, 189 (5th Cir. 1991)). For this Court to reverse a factual finding of the BIA, the applicant must show that "the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias-Zacarias*, 112 S.Ct. 812, 817 (1992);

15

*Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001).

   a. *Political Opinion*

   In order to gain asylum because of persecution due to political opinion, the alien must first show that his persecutors' actions were motivated by his, the alien's, political opinions. *Rivas-Martinez*, 997 F.2d at 1147. The relevant question is the motivation of the persecutor. The alien must demonstrate through some evidence, either direct or circumstantial, that the persecutors know of his (the alien's) political opinion and has or will likely persecute him *because* of it. *Id*. Ontunez argues that he produced evidence that *compels* such a finding.

   Ontunez relies upon two cases in which circuit courts found the applicant's actions to be political. In the first, *Osorio v. INS*, 18 F.3d 1017 (2nd Cir. 1994), a Guatemalan union leader fled to the United States after violence broke out in connection with his union's struggle with their employers, the Guatemalan government. The immigration judge denied asylum and withholding of deportation, and the BIA affirmed that decision on the grounds that struggles between labor and management were economic in nature. *Id*. at 1028. The Second Circuit reversed because it interpreted the BIA's decision as having illogically concluded that evidence of economic motivation precludes any finding of political persecution, much like our decision in *Rivas-Martinez*. *Id*. The court found that Osorio's activities had a political aspect because *the*

16

*government* perceived the union's economic struggle as threatening its political power. *Id*. at 1029-30.

The second case cited by Ontunez is *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988). In that case, Haitian fisherman Desir was ordered to pay bribes to the *Haitian security force*, the Ton Ton Macoutes. When he failed to pay the required bribes, Desir was arrested and assaulted by the Macoutes. *Id*. at 724-25. Desir fled to the United States, where the immigration judge and BIA refused him asylum or prohibition of deportation because his persecution arose solely because he failed to pay money. *Id*. at 725. The Ninth Circuit reversed, holding that Desir had amply proven that he was persecuted on account of his political opinion. The court relied upon sources deeming Haiti a "kleptocracy," or government by theft, and recognized that the failure to pay bribes in such a government not only offended the Ton Ton Macoutes's finances, but their politics as well. *Id*. at 727-28. Because the Duvalier regime ruled by the fear engendered by these forced bribes, Desir's resistance led to his categorization as a subversive. This categorization, the court held, was properly categorized as political resistance. *Id*. at 728.

In contrast, the INS refers us to the case of *Cuevas v. INS*, 43 F.3d 1167 (7th Cir. 1995). In that case, Felisa and Teofilo Cuevas owned land in the Philippines and rented it to farmers who used it to grow rice. The tenants stopped paying rent and

17

eventually demanded the right to buy the land. When the Cuevases refused, they were threatened by anonymous people whom they believed were connected with the New People's Army, the armed wing of the Communist Party in the Philippines. *Id*. at 1169. The Cuevases fled to America, but the immigration judge and BIA determined that they had not shown a well-founded fear of persecution on account of their political opinion. *Id*. The Seventh Circuit agreed, holding that despite the possible political connection "[p]etitioners have transformed a relatively minor land dispute in an isolated part of their country into a paranoic [sic] fear of harm anywhere in the Philippines." *Id*. at 1171.

Ontunez's case does not resemble *Osorio* and *Desir*, cases in which the alien acted in direct opposition to government policies. and instrumentalities. In those cases, the direct government connection cast a political shadow over an otherwise largely economic claim. Here, the closest connection between Ontunez and the government is that he stands in economic competition with the attorney for a businessman who is the nephew of the man who became President in 1998. Ontunez also draws a governmental connection from the fact that two local police officers were with the landlords when Puerto assassinated Mejia. Neither connection compels us to read his evidence in a new, more overtly political light.

On appeal, Ontunez must set forth evidence so compelling that

18

"no reasonable factfinder could fail to find" the requisite elements. *Elias Zacarias*, 112 S.Ct. at 817. Ontunez has not met this very difficult requirement because reasonable factfinders could be unpersuaded that the landlords were motivated by the political aspects of Ontunez's struggle. The landlords did not demand Ontunez's silence, they only demanded that he leave Las Delicias "in a good way or a bad way." This suggests that the landlords neither hated him for his general political opposition to the moneyed elites nor wished to silence his impassioned speeches; they just wanted him off the land so they could develop it. Second, Ontunez did not receive any threats while he was in San Pedro Sula, which suggests that the landlords were satisfied so long as he remained off the land. Third, we note that the landlords were willing to settle the land title issue with the campesinos. While the sum they demanded may have been more than the farmers could pay, as Ontunez alleges in his brief, the offer need not have been a sham and may have been a fair offer given Ontunez's testimony regarding the land's economic potential. At any rate, the offer indicates that the landlords were interested in the economic potential of Las Delicias and not in the broader political struggle.

While the landlords' focusing on the leaders of the Foundation rather than the rank-and-file campesinos might arguably suggest a political motive, that argument ultimately fails because the

19

evidence suggests that the landlords would not accept the passive presence of the campesinos any more than they accepted the vocal protests of Ontunez and the Foundation. Their goal was simply a vacant Las Delicias. As a result, we cannot say that all reasonable factfinders would feel compelled to accept Ontunez's interpretation of or inferences from the facts. We affirm the BIA's decision in this respect.

*b. Membership in a Particular Social Group*

Ontunez next claims that substantial evidence compels the conclusion that he was persecuted on account of his membership in the particular social group of "land rights leaders." To establish that he is a member of a "particular social group," he must show that he was a member of a group of persons that share a common characteristic that they either cannot change or should not be required to change because it is fundamental to their individual identities or consciences. *See Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985). Once the alien has made this showing, he must also show that he was persecuted "on account of" such membership.

The BIA did not reach the issue of whether Ontunez was a member of a particular social group constituted of activist agrarian cooperative leaders because it held that Ontunez had not shown that the landlords' actions were "on account of" such membership. Ontunez argues that the BIA made an impermissible "metaphysical" distinction between his status as a resistance

20

leader and the actions that led to that status; that is, that the BIA relied on the actions themselves without considering their import. We disagree with this construction, which takes a valid distinction and attempts to render it incoherent.

The evidence does not compel a finding that the landlords cared whether Ontunez was in the particular social group of "activist agrarian cooperative leaders"; it shows they cared about the land in Las Delicias but does not compel the conclusion that they cared about his activism generally. Ontunez only offered evidence of persecution against the Foundation, not against other agrarian leaders. The fact that a persecutor has not opposed other members of the same group suggests that the persecution was not on account of that group membership. *See Matter of R-A-*, Interim Decision 3403 (BIA 1999) ("If group membership were the motivation behind his abuse, one would expect to see some evidence of it manifested in actions toward other members of the same group."). Similarly, Ontunez offered no evidence suggesting that the landlords would be happy to allow the campesinos to stay if their leadership departed, as might be expected if the landlords were motivated by his membership in the group of activist leaders. Neither does his evidence suggest that the landlords would oppose him if he were a member of the agrarian activists but not impeding their plans for Las Delicias. Instead, Ontunez essentially testified that the landlords only cared about getting Las Delicias

21

or an equivalent amount of cash.

Ontunez failed to present evidence that takes the crucial step from persecution because of economic desire to persecution because of membership in the group of land activists.  The distinction is not "metaphysical."  Because he has not demonstrated evidence so compelling that reasonable factfinders could not find otherwise, we affirm the decision of the BIA in this respect.

*III. The Convention Against Torture*

Ontunez's final arguments concern his claim for withholding of deportation under the Convention Against Torture.  He argues that the BIA applied an incorrect legal standard to his case, and that his evidence compels findings of fact different than those reached by the BIA.  We apply the same standards of review applied to the BIA's holdings on asylum claims.  *See Carabajal-Gonzales v. INS*, 78 F.3d 194, 197 (5th Cir. 1996) (discussing those standards); *Kamalthas v. INS*, 251 F.3d 1279 (9th Cir. 2001) (applying same standards to Convention review); *Ali v. Reno*, 237 F.3d 591 (6th Cir. 2001) (generally applying the same standard to the Convention).  We must let stand a decision that an alien is not eligible for admission to the United States unless that decision is "manifestly contrary to law."  *Ali*, 237 F.3d at 596;  8 U.S.C. §§ 1252(b)(4)(c).

*a.  Legal Review*

Ontunez first argues that the BIA adopted the incorrect legal

22

standard when it stated:

> [T]he respondent must provide evidence that the torture he fears at the hands of the Facusse Group or their hit man would be "at the instigation of or with the consent or acquiescence of" Honduran officials or persons acting in an official capacity.  8 C.F.R. § 208.18(a)(1).

Because this statement did not include the burden of proof, which 8 C.F.R. § 208.16(c)(2) explains is "more likely than not," Ontunez asserts that the BIA applied an incorrect legal standard in reviewing his evidence.  We disagree.  Not every explanation of law must contain the burden of proof to be true, and the BIA's statement is correct as far as it goes.  Nothing in the BIA's opinion demonstrates that it misapplied the burden of proof.  We therefore reject this contention of Ontunez.

   b.  *Factual Review*

   In order for Ontunez to succeed in his request for withholding of removal based on the Convention, he must meet his burden of showing that more likely than not he would be subjected to "torture" upon his return.  *See* 8 C.F.R. § 208.16(c)(2).  Torture is defined in 8 C.F.R. § 208.18(a)(1), which requires *inter alia* that the "pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  The regulations later clarify that "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his

23

or her legal responsibility to intervene to prevent such activity." 8 U.S.C. § 208.18(a)(7). "Willful blindness" suffices to prove "acquiescence." *See In re S-V-*, Int. Dec. 3430 (BIA 2000) (en banc).

The BIA rejected Ontunez's request for withholding of deportation because he failed to show that Honduran public officials would acquiesce in his torture. Specifically, the BIA held that even if the landlords had general support in some sectors of the Honduran government, that support alone did not establish that Honduran officials would acquiesce in his torture. Ontunez challenges this finding, pointing out other governmental connections in his story: the police escort to the Mejia assassination, the fact that the police never apprehended the landlords for the assassination, the police clearing Las Delicias in 1997, the impunity given the landlords while they persecuted Foundation leaders, and the Honduran government's policy of dislodging squatters. Ontunez claims all this evidence would compel reasonable factfinders to find the necessary acquiescence by the Honduran government.

We disagree that his evidence compels a different result than the one reached by the BIA. First, while the police escort to the Mejia assassination is troubling, the police ultimately arrested Puerto, convicted him, and incarcerated him. Second, though the landlords were not arrested for the crime after Puerto's

24

confession, Ontunez's testimony that Melgar denied complicity in the assassination provides at least some explanation why the Honduran government did not prosecute or arrest them. Third, Ontunez argues police complicity in the clearing of Las Delicias, but he also testified that it was done pursuant to a court order. We can hardly fault the Honduran police for enforcing court orders, even though Ontunez claims the order was tainted. Fourth, the Honduran government does indeed have a policy of dislodging squatters, as noted in a State Department report, but Ontunez fails to note that the report says that the government only dislodges squatters who are on the land illegally, and does so with minimal force. *See* United States Department of State, *Honduras: Profile of Asylum Claims & Country Conditions*, January 1999, at 5-6. This does not suggest they would turn a blind eye to torture. Finally, the possible connection between Melgar and President Flores does not compel a finding that the President would ignore torture, especially in light of Ontunez's repeated testimony that the landlords attempted to follow the legal process.

Ontunez has not presented evidence that compels a finding that officials would acquiesce in "torture" committed by the landlords. Accordingly, we will affirm the decision of the BIA.

### Conclusion

Though Ontunez was placed in danger by his fight for Las Delicias, he has not proffered evidence that *compels* a finding that

25

the danger arose from his persecutors' view of his political opinions or his membership in the group of land activists.  Neither does the evidence compel the conclusion that the Honduran government would acquiesce in acts of torture by the landlords.  Finally, we are not persuaded that the BIA made material legal errors in its opinion.  The decision of the BIA must therefore be affirmed.

AFFIRMED