**UNITED STATES of America,**

v.

**Jose Alberto LUBO.**

**No. EP–03–CR–245–DB.**

United States District Court,
W.D. Texas,
El Paso Division.

May 16, 2003.

Ahilan Thevanesan Arulanantham, Federal Public Defender, Western District of Texas, El Paso, TX, for defendant.

David L. Nichols, U.S. Attorney's Office, Lark Elizabeth Saad, Assistant United States Attorney, El Paso, TX, U.S. Attorneys.

## ORDER

BRIONES, District Judge.

On this day, the Court considered Defendant Jose Alberto Lubo's "Motion to Dismiss the Indictment" ("Motion to Dismiss"), filed in the above-captioned cause on April 10, 2003. The Government filed a Response on April 17, 2003, and Defendant filed a Reply on April 25, 2003. After due consideration, the Court is of the opinion that Defendant's Motion should be denied.

## BACKGROUND

Defendant has traveled a long road to get where he is today. He is a native and citizen of Mexico, born in Ciudad Juarez, Chihuahua, on September 6, 1969, who gained lawful permanent resident status in the United States on January 16, 1991. Less than fifteen months later, at age 22, Defendant was arrested in the District of New Mexico for possession with intent to distribute less than fifty kilograms of marijuana. He was released on bond. Defendant was indicted by the grand jury on April 22, 1992, for violating 21 U.S.C. § 841(a)(1) and 841(b)(1)(D).

While on bond, Defendant resided in El Paso, Texas. Defendant reports that on September 18, 1992, he was approached by an individual who demanded that Defendant either return some cocaine that was missing, or prove that it had been seized. Defendant was unable to do either. Apparently, members of the Juarez drug cartel, for whom Defendant was working on the day he was arrested, believed that the car he was driving carried more than the seized marijuana that was the subject of the Indictment. On September 24, 1992, Defendant reported to the El Paso Police Department ("EPPD") that he was approached by two men who, for no known reason, began fighting with him.[1] In the course of that fight, Defendant suffered a gun-shot wound to his back. However, the case was closed on October 26, 1992, due to Defendant's failure to respond to the EPPD's attempts to contact him as part of their follow-up investigation. Defendant now reports that the assailant who shot him was the same individual who approached him six days earlier regarding the missing cocaine.

On October 29, 1992, Defendant pled guilty to the Indictment. A judgment of conviction was entered on November 5, 1992, in which Defendant was sentenced to a fifteen-month term of imprisonment, to be followed by three years of supervised release. After serving his term of imprisonment, Defendant was deported from El Paso to Juarez, Mexico by the Immigration and Naturalization Service ("INS")[2]

---

1. The EPPD's initial Complaint Report states that Defendant reported that "the two suspects approached him and began to fight with him for no known reason."

2. The subset of the INS responsible for this type of enforcement action is now incorporated into the present day Bureau of Immigration and Citizenship Services under the United States Department of Homeland Security.

on February 2, 1994, pursuant to Sections 241(a)(2)(A)(iii) and 241(a)(2)(B)(i) of the Immigration and Nationality Act ("INA"). Those sections of the INA, as it read on February 2, 1994, provided for deportation of aliens convicted of an aggravated felony and of certain state, federal, or foreign nation controlled substance laws.[3]

After remaining in Juarez only a few days, Defendant illegally reentered the United States allegedly because he feared that members of the drug cartel still wanted to kill him. Defendant went to live in Austin, Texas, where he resumed his narcotic trafficking activity. On October 4, 1994, eight months to the day after he was deported, Defendant was charged in a four-count indictment in the Austin Division of the Western District of Texas with (1) possessing with intent to distribute cocaine and cocaine base, and aiding and abetting another to do so, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; (2) conspiring to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846; (3) using and carrying a Norinco SKS semiautomatic assault rifle during and in relation to the crimes of conspiring to possess with intent to distribute and possessing with intent to distribute cocaine and cocaine base, and aiding and abetting another to do so, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2; and (4) being a felon in possession of the assault rifle, in violation of 18 U.S.C. § 922(g). Defendant pled guilty to the first two counts on January 12, 1995. On March 30, 1995, the court imposed two fifty-seven month terms of imprisonment on each count, which ran concurrently, followed by a five-year term of supervised

release. On February 5, 1999, after serving his sentence, Defendant was again removed from the United States to Mexico, this time through the south Texas port of entry at Hidalgo, across the border from Reynosa, Mexico.

Defendant returned to Juarez, over 800 miles from Reynosa, and was once again confronted by individuals that Defendant asserts are Mexican police officers associated with the drug cartel. After these individuals stabbed him in an apparent attempt on his life, Defendant again illegally entered the United States in December 1999, near San Elizario, Texas, just outside El Paso. Ultimately, Defendant was apprehended on or about October 17, 2002. The INS issued Defendant a "Notice of Intent/Decision to Reinstate Prior Order" (the "Reinstatement Order"), informing him that, pursuant to INA § 241(a)(5), 8 U.S.C. § 1231(a)(5), his prior order of removal, dated January 10, 1996, would be reinstated. Defendant acknowledged the notice on October 25, 2002. During this time, Defendant told INS officials that he feared returning to Mexico.

Defendant was interviewed by an INS asylum officer to determine whether he should be referred to an immigration judge ("IJ") to apply for withholding or deferral of removal based on his fear of returning to Mexico. On December 5, 2002, Defendant relayed his story to the asylum officer, stating that the Juarez drug cartel sent attackers to El Paso in 1992 to bring him back to Juarez. When he refused, they shot him. He also reported that he returned to Juarez from Reynosa, Mexico, within three days of being

---

**3.** In 1994, INA § 241(a)(2)(A)(iii) provided for removal of aggravated felons. 8 U.S.C.A. § 1251(a)(2)(A)(iii) (West 1993). Section 241(a)(2)(B)(i) provided for removal of "[a]ny alien who at any time after entry has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a

State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana...." *Id.* § 1251(a)(2)(B)(i).

removed in 1999. Defendant stated to the officer that he was staying in a Juarez hotel on his way to El Paso when Mexican police officers working for the Juarez cartel found him and tried to kill him. Bleeding from a knife wound to the arm, he escaped into El Paso. Defendant expressed his concern that the power of the Juarez cartel extended beyond Juarez to points across the United States. Although finding Defendant's testimony credible, the asylum officer determined that Defendant did not fear persecution or torture at the hands of the Mexican government or public officials acting in their official capacity. Instead, Defendant's fears of returning to Mexico arose from his dealings with members of the Juarez drug cartel who believed that Defendant had lost or stolen a load of cocaine. The asylum officer found that Defendant had failed to establish a reasonable fear of persecution or torture that would support withholding or deferral of removal.

Defendant was then referred to an IJ who held a hearing on the matter on January 6, 2003. After taking testimony on Defendant's background and his reasons for fearing return to Mexico, the IJ found that Defendant had not established a reasonable fear that he would be persecuted based on his race, nationality, social group, or political opinion, nor would he be tortured if removed to Mexico. The IJ affirmed the asylum officer's determination and returned the case to the INS to remove Defendant. The Order of the Immigration Judge states: "This is a final order. There is no appeal available." That night, Defendant was again removed through El Paso to Mexico, but returned five days later, apparently fearing for his life. On February 5, 2003, Defendant was indicted pursuant to 8 U.S.C. § 1326 in the El Paso Division of the Western District of Texas for illegal re-entry into the United States after having been deported. Defendant entered a plea of not guilty on February 19, 2003. The instant Motion followed.

## THE MOTION TO DISMISS

■ To convict Defendant of illegal reentry, the Government would have to prove beyond a reasonable doubt (1) that Defendant was an alien at the time of the indictment; (2) that Defendant had previously been removed from the United States; (3) that thereafter Defendant knowingly entered the United States; and (4) that Defendant had not received the consent of the Attorney General of the United states to reenter. *United States v. Benitez–Villafuerte*, 186 F.3d 651, 656 n. 7 (5th Cir.1999) (citation omitted). In his Motion to Dismiss, Defendant argues that the removal order on which the indictment is based cannot be used against Defendant to establish the second element of the charge of illegal reentry pending against him, pursuant to 8 U.S.C. § 1326(d) and *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987).

Defendant argues that the IJ erred when he told Defendant that the Order of the Immigration Judge affirming the asylum officer's reasonable fear determination was a final order not subject to appeal. Defendant contends that this denial of judicial review was fundamentally unfair and resulted in prejudice to Defendant, therefore, the Government cannot use the removal order to support its prosecution of Defendant for illegal reentry. Specifically, Defendant argues that he has shown a reasonable likelihood that he would have prevailed on appeal of his claim made pursuant to the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").

Thus, the argument Defendant presents in his Motion to Dismiss does not challenge the 1996 removal order. Instead, it

challenges the January 6, 2003 Order of the Immigration Judge denying Defendant withholding of removal, which order was entered as part of the reinstatement of removal proceedings which began in October 2002. Defendant's Motion to Dismiss, therefore, collaterally attacks the January 6, 2003, Reinstatement Order, entered pursuant to INA § 241(a)(5), 8 U.S.C. § 1231(a)(5). The success or failure of Defendant's collateral attack on the Reinstatement Order depends on the merits of his challenge to the Order of the Immigration Judge.

## STANDARD

INA § 241(a)(5) provides for reinstatement of removal orders against aliens who illegally reenter the United States:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C.A. § 1231(a)(5) (West 1999). The procedures under which the INS reinstates prior orders of removal are provided in 8 C.F.R. § 241.8, which specifies that the alien has no right to a hearing before an immigration judge. 8 C.F.R. § 241.8(a) (2003).[4] Similarly, the Board of Immigration Appeals ("BIA") has no jurisdiction to review a reinstatement order. 8 U.S.C.A. § 1231(a)(5) (West 1999); *In re G–N–C,* 22 I. & N. Dec. 281, Inter. Dec. 3366, 1998 WL 646918 (B.I.A.1998). However, the United States Court of Appeals for the

Fifth Circuit has held that, because a reinstatement order is a final order of the INS, it is subject to judicial review by the Court of Appeals under § 242 of the INA, 8 U.S.C. § 1252, even though it is not literally an order of removal. *Ojeda–Terrazas v. Ashcroft,* 290 F.3d 292, 295 (5th Cir.2002). Review is limited, however, to the lawfulness of the reinstatement order itself and cannot extend to the underlying order of removal. *Id.*

■ To successfully challenge the use of a prior removal order in a prosecution for illegal reentry under 8 U.S.C. § 1326, a defendant must satisfy both the requirements of *United States v. Mendoza–Lopez* and 8 U.S.C. § 1326(d). In *Mendoza–Lopez,* the Supreme Court held that, where a prior deportation is an element of a crime, a defendant may challenge the validity of the administrative proceeding where defects in the proceeding effectively eliminated the alien's right to judicial review. *Mendoza–Lopez,* 481 U.S. at 839, 107 S.Ct. at 2156. The Fifth Circuit, interpreting *Mendoza–Lopez,* held that, to successfully challenge the validity of an underlying deportation order, an alien must establish that: "(1) the prior hearing was 'fundamentally unfair'; (2) the hearing effectively eliminated the right of the alien to challenge the hearing by means of judicial review of the order; and (3) the procedural deficiencies caused the alien actual prejudice." *United States v. Lopez–Vasquez,* 227 F.3d 476, 483 (5th Cir.2000) (citations omitted). According to the Fifth Circuit, Congress effectively codified this interpretation of *Mendoza–Lopez* in 8 U.S.C. § 1326(d). *Id.* at 483 n. 13. That section provides:

> In a criminal proceeding under this section, an alien may not challenge the

---

**4.** Title I of the Code of Federal Regulations was revised on January 1, 2003. The revision did not affect any section cited in this Order that was in effect in 2002 during Defendant's reinstatement proceedings.

validity of the deportation order described in subsection (a)(1) or subsection (b) of this section unless the alien demonstrates that:

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceeding at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

8 U.S.C.A. § 1326(d) (West 1999).

## DISCUSSION

Defendant argues that, because the IJ who affirmed the asylum officer's reasonable fear determination informed Defendant that the Order of the Immigration Judge was final and no appeal was available, he was improperly denied judicial review of his CAT claim. For its part, the Government contends that, because Defendant was undergoing reinstatement of a prior order of removal under INA § 241(a)(5), 8 C.F.R. § 208.31 is the controlling regulation. As discussed below, § 208.31(g)(1) precludes appeal of the IJ's decision. Although § 208.31 does not specifically reference the CAT, the Government also contends that its appeal preclusion provision applies to Defendant's claim pursuant to the CAT.

In his Reply, Defendant attempts to clarify the grounds for his application, stating that he does not claim to be eligible for withholding of deportation, only that he was eligible for relief under CAT, which Defendant asserts is a distinct form of protection. None of the exhibits relating to the reasonable fear determination provided by Defendant or the Government indicate that Defendant made his claim of fear of being returned to Mexico under one provision or the other. The Background

paragraph of the December 12, 2002 Reasonable Fear Determination prepared by the asylum officer indicates that "[a]pplicant sought a reasonable fear interview and was given an orientation on November 21st 2002." The Analysis paragraph indicates that the officer considered Defendant's application under both possible avenues. The first sentence of the Analysis paragraph clearly mirrors the language of INA § 241(b)(3)(A):

> To establish a reasonable fear of persecution, the applicant must establish that there is a reasonable possibility he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion in the country to which he or she has been ordered removed.

The second sentence specifically references the CAT and reflects the language of 8 C.F.R. § 208.16(c)(2):

> To establish a reasonable fear of torture, the applicant must establish that there is a reasonable possibility he or she would be subjected to torture, as defined in the Convention against [sic] Torture and U.S. regulations, in the country to which he or she has been ordered removed.

From this, it appears that the asylum officer considered both avenues for withholding of removal and found neither to apply.

### A. Provisions Governing Withholding of Removal

Two avenues for relief in the form of withholding of removal are potentially available to an alien who fears returning to his native country. The first is withholding of removal under § 241(b)(3)(A) of the INA, 8 U.S.C. § 1231(b)(3)(A), which precludes removing an alien to a country if the Attorney General decides "that the alien's life or freedom would be threatened in that country because of the alien's race,

religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1231(b)(3)(A) (West 1999). The other avenue is withholding of removal under the CAT, ratified by the United States and implemented by Section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105–277, 112 Stat. 2681. These are separate forms of relief and receive separate analytical attention. *Efe v. Ashcroft,* 293 F.3d 899, 906–07 (5th Cir.2002).

■ Procedures for considering applications for withholding of removal under § 241(b)(3)(A) of the INA are provided in 8 C.F.R. § 208.16. In removal proceedings, an immigration judge has jurisdiction to review these and other similar decisions, subject to appeal to the Board of Immigration Appeals. 8 C.F.R. §§ 208.2(b) and 3.1(b)(9) (2003); *see also In re M–B–A,* 23 I. & N. Dec. 474, Inter. Dec. 3480, 2002 WL 31201697 (B.I.A.2002). However, for an alien such as Defendant who is undergoing proceedings to reinstate a prior final order of removal under INA § 241(a)(5), 8 C.F.R. § 208.31 describes the standards and procedures to be followed when the alien expresses fear of returning to the country of removal. An asylum officer's negative reasonable fear determination under § 208.31 is subject to review by an IJ, however, the IJ's decision is not subject to appeal. 8 C.F.R. §§ 208.31(g) and 208.2(c)(2)(i) (2003).

CAT relief, on the other hand, is governed in part by different provisions. Section 2242(b) of the FARRA requires the appropriate agencies to prescribe regulations to implement the CAT. For this purpose, the INS promulgated 8 C.F.R. § 208.18. Procedures for considering applications for withholding of removal under the CAT are provided in 8 C.F.R. § 208.16. To qualify for withholding of removal under the CAT, an applicant must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (2003). "Torture" is defined at length in the CAT implementing regulation. 8 C.F.R. § 208.18(a)(1) (2003). The applicant need not show that he is subject to torture as a member of any group or because of his political views. An immigration judge has jurisdiction to review these decisions, subject to appeal to the BIA. *See In re M–B–A,* 23 I. & N. Dec. 474, Inter. Dec. 3480, 2002 WL 31201697 (B.I.A.2002); *In re G–A,* 23 I. & N. Dec. 366, Inter. Dec. 3471, 2002 WL 968630 (B.I.A.2002). Section 2242(d) of the FARRA limits *judicial* review of CAT decisions, stating in pertinent part:

> [N]othing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (s), *except as part of the review of a final order of removal* pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252). (Emphasis added)

*B. Defendant's Challenge to the Order of the Immigration Judge*

■ Because Defendant faces reinstatement of a prior order of removal under INA § 241(a)(5), 8 C.F.R. § 208.31 applies, and § 208.31(g)(1) precludes appeal of the Order of the Immigration Judge affirming the asylum officer's reasonable fear determination. Under these provisions, therefore, the Court finds that the IJ's statement that the Order of the Immigration Judge is final and not subject to appeal was not error.

Defendant argues, however, that judicial review of the CAT decision *is* available under § 2242(d) of the FARRA. That section, however, allows judicial review only

as part of the review of a "final order of removal," pursuant to INA § 242. Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, 112 Stat. 2681. Here, the order under attack is the Reinstatement Order issued pursuant to INA § 241(a)(5). As previously mentioned, a reinstatement order is not an order of removal. *Ojeda–Terrazas,* 290 F.3d at 295. Defendant's reliance on FARRA § 2242(d) is therefore misplaced. The best Defendant could have done is sought judicial review of the Reinstatement Order itself, which he did not do. The Court finds that, under these provisions as well, the IJ's statement that the Order of the Immigration Judge is final and not subject to appeal was not error.

## C. Defendant's Collateral Attack on the Reinstatement Order

Regarding Defendant's challenge to the Reinstatement Order, it is important to note that Defendant does not claim that the IJ misinformed him that he could not appeal the Reinstatement Order to the Fifth Circuit, although there is no indication that the IJ or the INS officer told him that he could. The Order of the Immigration Judge states: "This order is final. There is no appeal available." The statement appears on the Order of the Immigration Judge and pertains only to that order. It does not refer to the Reinstatement Order. As such, the Court is of the opinion that the IJ did not misinform Defendant that he could not appeal the Reinstatement Order, which would have been error in light of *Ojeda–Terrazas.*

However, the body of the Order of the Immigration Judge, which is a pre-printed check-the-box form order, states that "the case is returned to the INS for removal of the alien," meaning, under these circumstances, execution of the Reinstatement Order. It would not be far-fetched for an alien, unrepresented and facing reinstatement of a prior order of removal, to under-stand that "there is no appeal available" from that aspect of the Order of the Immigration Judge. Though presumably not intended to do so, such an inadvertent communication might, under some conditions, result in a denial of judicial review of a reinstatement order to which an alien is entitled. *See Ojeda–Terrazas,* 290 F.3d at 295. Having so determined, the Court, out of an abundance of caution, will consider whether Defendant was indeed prejudiced by any such understanding of the Order of the Immigration Judge.

## D. No Fundamental Error

■ Even if the IJ improperly denied Defendant judicial review, Defendant has not shown that it was fundamental error because he has failed to show prejudice. "A showing of prejudice means 'there was a reasonable likelihood that but for the errors complained of the defendant would not have been deported.' " *Benitez–Villafuerte,* 186 F.3d at 658–59 (quoting *United States v. Estrada–Trochez,* 66 F.3d 733, 735 (5th Cir.1995)). "In short, '[i]f the defendant was legally deportable and, despite the INS's errors, the proceeding 'could not have yielded a different result,' the deportation is valid for purposes of section 1326." *Id.* at 659 (quoting *United States v. Galicia–Gonzalez,* 997 F.2d 602, 603 (9th Cir.1993)).

To qualify for CAT protection, the torture that an applicant seeks to avoid must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Moreover, in assessing a CAT claim, "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured" may be considered. 8 C.F.R. § 208.16(c)(3)(ii).

Defendant argues that he has shown a reasonable likelihood that he would have

been found eligible for relief under the CAT had he not been denied his right to appeal. The Court disagrees. Defendant has shown little more than that he is a twice-convicted drug trafficker who, despite the fact that Mexico is a large country, chose to return to Juarez where the cartel that was after him is headquartered.[5]

Defendant bases his CAT argument on his assertion that individuals working for the Juarez drug cartel who are also Mexican police officers twice attempted to kill him. Because these dealers of doom are reportedly Mexican police officers, Defendant argues that he will be subject to torture from which the CAT is intended to protect him. Defendant relies in part on the Fifth Circuit decision in *Ontunez– Tursios v. Ashcroft* in which the court upheld the BIA's denial of a CAT claim because the applicant failed to show that government officials acquiesced in torture inflicted by private landlords. 303 F.3d 341 (5th Cir.2002). Likening *Ontunez– Tursios* to the instant cause, Defendant points to the part of the opinion where the court found troubling the presence of police officers during an assassination associated with the alleged torture. *Id.* at 354. The court continued, however, to recognize that the police ultimately arrested and convicted the assassin. *Id.*

Defendant also quotes passages from the United States Department of State's Country Reports on Human Rights Practices—2002 ("the Report"), released on March 31, 2003, indicating that police corruption is widespread and that the police "sometimes tortured persons." *available at* http://www.state.gov/g/drl/rls/hrrpt/ 2002/18338pf.htm. The Report also states, however, that "[t]he Government generally respected many of the human rights of its citizens" and "[t]he Government continued to take important steps to improve the human rights situation. . . ." *Id.* The Report details numerous cases of human rights abuses by members of security and police forces where the violating officials were ultimately arrested. *Id.* (under subheading "Respect for Human Rights," Section 1a). The Report also states that, "[i]n August, Roberto Garreton, the representative for Latin America to the [United Nations High Commission for Human Rights], stated that torture continued in the country; however, he stated that he had seen positive changes since he last visited the country in 1998." *Id.* (under subheading "Respect for Human Rights," Section 1c). Additionally, the Report includes details of incidents where public officials accused of corruption are themselves tortured in the process of investigating their alleged corrupt activity. *Id.* Of note, the Report describes an operation during which the Mexican Army and agents from the Federal Investigations Agency (AFI), supervised by the Special Branches of the Attorney General's office (PGR), "lured over 150 municipal and state

---

**5.** Defendant may also fall into a category of applicant for whom denial of an application for withholding of removal under § 241(b)(3) or the CAT is mandatory. 8 C.F.R. § 208.16(d)(2) requires denial if the applicant falls within INA § 241(b)(3)(B), 8 U.S.C. § 1231(b)(3)(B). That section includes aliens whom the Attorney General decides are dangers to the community of the United States in relation to their having been convicted of a particularly serious crime. 8 U.S.C.A. § 1231(b)(3)(B)(ii). An alien such as Defen-

dant who has been convicted of an aggravated felony, or felonies, for which the alien has been sentenced to an aggregate term of imprisonment of at least five years is considered to have committed a particularly serious crime for purposes of this statute. *Id.* § 1231(b)(3)(B). Thus, should the Attorney General decide that Defendant is a danger to the community, his application would be denied mandatorily. Defendant would be left with only deferral of removal under 8 C.F.R. § 208.17 as a potential form of relief.

police officers from throughout northern Baja California for a meeting, then arrested more than 50 officers for corruption." *Id.* In sum, the Report does not support Defendant's claim that the police officers who assaulted Defendant were acting in their official capacity or with the acquiescence of other officials. If anything, those portions of the Report illustrating the measures taken by the Mexican government to end the abuse establishes that public officials in Mexico who engage in torture are acting *outside* their official capacities.

It is clear as well from Defendant's own version of the story that he is the target of a drug cartel, not of Mexican officials acting in their official capacity. First, Defendant claims that *"members of the cartel* for whom Mr. Lubo was driving" believed that the car he was driving on the day he was arrested in 1992 contained cocaine as well as marijuana. Then, a *"member of the cartel* who was also a Mexican police officer" approached him in El Paso, Texas, not in Mexico, concerning the cocaine. Ultimately, "that same Mexican police officer *working for the Juarez Cartel*" shot him in the back in El Paso. Years later, after returning to Juarez from Reynosa, Defendant realized that *"the cartel* still wanted to kill him." Then, when "several police officers *associated with the cartel*" stabbed him, he escaped into El Paso. Defendant states that, at his reasonable fear interview, he told the asylum officer that "Mexican police officers *working for the Juarez cartel*" tried to kill him.

Defendant has clearly demonstrated that he knows that the individuals he fears are members of or are working for the cartel. Whether they are dressed as Mexican police officers, firefighters, or sanitation workers makes no difference. Defendant has failed to show that these individuals were acting in their official capacities as Mexican police officers when they attempted to kill him. To the contrary, Defendant repeatedly recognizes that they are "working for the cartel." [6]

Defendant's choice to return to Juarez within days of his second removal through Hidalgo, Texas, would also weigh against granting his CAT claim. Defendant was able to travel over 800 miles from Reynosa, but instead of seeking safety in another part of Mexico, he headed straight into the waiting arms of his adversaries in Juarez. Having previously been unwilling to protect himself by staying away from Juarez, Defendant now wants to stay in the United States, even though he believes that the Juarez cartel exerts significant influence across this nation.

Finally, Defendant's reliance on the Report from the State Department does not help his case. Though the report recognizes that there are human rights abuses occurring in Mexico, it also points out that the government of Mexico is actively attempting to put a stop to such abuses, and is not supporting or acquiescing to them.

Defendant contends that he has shown that he had a good chance of prevailing on appeal had the IJ not denied him his day in court. This Court, however, is of the opinion that Defendant's argument is too weak to make such a claim. Therefore, the Court finds that Defendant cannot show that he was prejudiced by the Order of the Immigration Judge.

---

**6.** It is telling that Defendant's first reported negative encounter, resulting in Defendant's gun-shot wound, occurred in the United States, where he apparently wants to stay, and not in Mexico, the country he wants to avoid. Clearly, El Paso, Texas is well outside the jurisdiction of any Mexican official, making even more untenable Defendant's assertion that the Mexican police officers were acting in their official capacities.

## CONCLUSION

For the foregoing reasons, the Court finds that the IJ's ruling affirming the reasonable fear determination made by the INS asylum officer pursuant to INA § 241(b)(3) and the CAT was not subject to appeal. The Court further finds that its was not error for the IJ to inform Defendant accordingly. The Court is also of the opinion that, even if the Order of the Immigration Judge inadvertently communicated to Defendant that the Reinstatement Order was not subject to appeal, the denial of that appeal was not fundamental error because Defendant has failed to show that he suffered any prejudice.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Jose Alberto Lubo's "Motion to Dismiss the Indictment" is **DENIED.**